320 F.3d 200
 BROWN & WILLIAMSON TOBACCO CORPORATION, BWTdirect, LLC and Santa Fe Natural Tobacco Co., Inc., Plaintiffs-Appellees,
v.
George E. PATAKI, in his official capacity as Governor of the State of New York, Eliot Spitzer, in his official capacity as Attorney General of the State of New York, Antonia C. Novello, M.D., in her official capacity as Commissioner of Health of the State of New York and Arthur J. Roth, individually and in his capacity as Commissioner of Taxation and Finance of the State of New York, Defendants-Appellants,
Teresa Mason, individually and in her capacity as Sheriff of the City of New York, Defendant.
 Docket No. 01-7806.
 Docket No. 01-7813.
 United States Court of Appeals, Second Circuit.
 Argued: June 14, 2002.
 Decided: February 13, 2003.
 
 COPYRIGHT MATERIAL OMITTED Lisa M. Landau, Assistant Attorney General of the State of New York, New York, N.Y. (Eliot Spitzer, Attorney General of the State of New York, Caitlin J. Halligan, Solicitor General of the State of New York, Daniel Smirlock, Deputy Solicitor General, Andrew Bing, Assistant Solicitor General, on the briefs), for Defendants-Appellants.
 David H. Remes, Covington & Burling, Washington, DC (M. Stacey Bach, Covington & Burling, Washington, DC, Laurence A. Silverman, Mark P. Gimbel, Covington & Burling, New York, NY, on the brief), for Plaintiffs-Appellees Brown & Williamson Tobacco Corp. and BWTDirect, LLC.
 Rodrick J. Enns, Enns & Archer LLP, Winston-Salem, NC (Franklin B. Velie, Dierdre A. Burgman, Salans Hertzfeld Heilbronn Christy & Viener, New York, NY), for Plaintiff-Appellee Santa Fe Natural Tobacco Co., Inc.
 Before: MINER, CABRANES, and POOLER, Circuit Judges.
 Judge CABRANES concurs in the judgment.
 MINER, Circuit Judge.
 
 
 1
 Defendants-appellants the Governor of the State of New York and other State officials (the "State") appeal from a judgment entered in the United States District Court for the Southern District of New York (Preska, J.) striking down as unconstitutional section 1399-ll of New York's Public Health Law ("the Statute"), the court having found that the Statute discriminates against interstate commerce in violation of the Commerce Clause. The Statute prohibits cigarette sellers and common and contract carriers from shipping and transporting cigarettes directly to New York consumers.
 
 
 2
 Plaintiffs-appellees, Santa Fe Natural Tobacco Co., Inc. ("Santa Fe"), Brown & Williamson Tobacco Corporation and BWTDirect, LLC (together "B & W") filed complaints, later consolidated in the district court, challenging the constitutionality of the Statute under the Commerce Clause and seeking to enjoin its enforcement. On November 13, 2000, the district court issued a temporary restraining order prohibiting enforcement of the Statute. On April 24, 2001, the district court consolidated the hearing on a motion for preliminary injunction with a trial on the merits. Following a five-day bench trial, the district court, in an unpublished corrected opinion, declared the Statute to be an unconstitutional violation of the Commerce Clause and permanently enjoined its enforcement. Santa Fe Natural Tobacco Co., Inc. v. Spitzer, Nos. 00-7274, 00-7750, 2001 WL 636441 (S.D.N.Y. June 8, 2001).
 
 
 3
 The court found that the Statute was subject to strict scrutiny because it discriminated against interstate commerce both on its face "by requiring that retail sales take place only in-state," id. at *13, and in effect by "effectively bann[ing interstate direct shippers] from engaging in retail cigarette sales with New York customers," id. at *17. In applying strict scrutiny, the court concluded that the State failed to demonstrate the absence of less discriminatory means of advancing a legitimate state interest. Id. at *21-28. In the alternative, the court found that the Statute also failed the less stringent Pike balancing test because the marginal ability of the Statute to further its "wholly laudable goals" was outweighed by its substantial interference with interstate commerce. Id. at *29. The State timely appealed.
 
 
 4
 For the reasons that follow, we reverse.
 
 BACKGROUND
 
 5
 The background of this case is set forth in precise detail in the district court's opinion, familiarity with which is assumed. Only the facts necessary to our disposition are recounted here.
 
 I. The Statute
 
 6
 On August 16, 2000, section 1399-ll of New York's Public Health Law, entitled "Unlawful shipment or transport of cigarettes," was signed into law. The Statute reads in relevant part:
 
 
 7
 1. It shall be unlawful for any person engaged in the business of selling cigarettes to ship or cause to be shipped any cigarettes to any person in this state who is not: (a) a person licensed as a cigarette tax agent or wholesale dealer...; (b) an export warehouse proprietor... or an operator of a customs bonded warehouse ...; or (c) a person who is an officer, employee or agent of the United States government, this state or a department, agency, instrumentality or political subdivision of the United States or this state, when such person is acting in accordance with his or her official duties....
 
 
 8
 2. It shall be unlawful for any common or contract carrier to knowingly transport cigarettes to any person in this state reasonably believed by such carrier to be other than a person described in paragraph (a), (b) or (c) of subdivision one of this section. For purposes of the preceding sentence, if cigarettes are transported to a home or residence, it shall be presumed that the common or contract carrier knew that such person was not a person described in paragraph (a), (b) or (c) of subdivision one of this section. It shall be unlawful for any other person to knowingly transport cigarettes to any person in this state, other than to a person described in paragraph (a), (b) or (c) of subdivision one of this section. Nothing in this subdivision shall be construed to prohibit a person other than a common or contract carrier from transporting not more than eight hundred cigarettes at any one time to any person in this state.
 
 
 9
 N.Y. Pub. Health Law §§ 1399-ll (1)-(2). Simply put, subdivision one subjects to civil and criminal penalties cigarette sellers who ship cigarettes directly to New York consumers, and subdivision two subjects to the same penalties those who transport cigarettes to New York consumers. Subdivision two specifically applies to "any common or contract carrier," or "any other person" not a common or contract carrier, that "knowingly" transports cigarettes to anyone other than a permitted recipient, as defined in subdivision one of the Statute. Id. § 1399-ll (2).[1] Subdivision two includes a limited exception from the penalties for direct delivery of cigarettes, which permits the delivery by "a person other than a common or contract carrier" of four cartons or fewer of cigarettes to "any person in this state." Id.
 
 
 10
 The legislative findings made in support of the Statute "declare[ ] that the shipment of cigarettes sold via the internet or by telephone or by mail order to residents of this state poses a serious threat to public health, safety, and welfare, to the funding of health care ..., and to the economy of the state." Id. ch. 262, § 1. The legislature also found that cigarette sales accomplished through direct shipment made the verification of the purchaser's age difficult and that existing penalties for cigarette bootlegging were inadequate. Id.
 
 II. The District Court's Opinion
 
 11
 A. The District Court's Finding That the Statute Discriminates Facially and in Effect
 
 
 12
 The district court applied strict scrutiny analysis based on its determination that the Statute discriminated against interstate commerce both on its face and in effect. Id. at *13, *17. The court found that the Statute was facially discriminatory for two reasons. First, the court concluded that although the Statute's prohibitions apply to both in-state and out-of-state direct cigarette sellers,
 
 
 13
 the law, on its face, discriminates against interstate commerce by requiring that retail sales take place only in-state. Specifically, subdivision 1 prohibits the direct shipment of cigarettes to any person in New York who is not a licensed tax agent or wholesaler, export warehouse proprietor, operator of a customs bonded warehouse, or government official. Therefore, the only way to effect a retail sale to a New York consumer is by an in-state, face-to-face transaction. Thus, subdivision 1 shifts the interstate retail market to instate brick-and-mortar retailers.
 
 
 14
 Id. at *13. Second, the court found facially discriminatory the so-called delivery exception embodied in the last sentence of subdivision two. N.Y. Pub. Health Law § 1399-ll (2). The court rejected the State's argument that the exception "only permits consumers[, rather than brick-and-mortar retailers with home-delivery services,] to transport up to four cartons of cigarettes to their homes or to other individuals." Santa Fe, 2001 WL 636441, at *14.
 
 
 15
 The court found instead that "[a]s the statute is drafted, out-of-state retailers that depend on common or contract carriers are prohibited from directly selling and delivering cigarettes to consumers, while in-state brick-and-mortar outlets that have their own delivery services are not." Id. The court concluded that because of this "local benefit," the Statute "discriminates on its face against interstate commerce by providing a delivery exemption for New York brick-and-mortar businesses with their own delivery services." Id.
 
 
 16
 For similar reasons, the court found that the Statute discriminates against interstate commerce in effect. Id. at *16-17. First, the court stated that "[t]he only way an out-of-state seller could legally sell retail cigarettes to New York consumers under [the Statute] is to establish a brick-and-mortar outlet in New York." Id. at *16. The court credited testimony that this option was "unworkable" and "uneconomic" for the Plaintiffs and that, as a result, "the effect of [the Statute] is to eliminate out-of-state direct sales retailers from the market by requiring face-to-face, in-state retail sales only." Id. Citing the Supreme Court's decision in Halliburton Oil Well Cementing Co. v. Reily, 373 U.S. 64, 72, 83 S.Ct. 1201, 10 L.Ed.2d 202 (1963), the district court found the Statute's effect discriminatory because "[a] state may not require an out-of-state operator `to become a resident in order to compete on equal terms.'" Santa Fe, 2001 WL 636441, at *16.
 
 
 17
 Second, the court concluded that the delivery exception also discriminated against interstate commerce in effect based on the finding that "it is not economically feasible for interstate businesses to make deliveries to New York customers using their own trucks." Id. According to the court, the delivery exception therefore demonstrates another way in which "interstate direct sellers are effectively banned from engaging in retail cigarette sales with New York consumers." Id. at *17.
 
 
 18
 B. The District Court's Rejection of the Justifications Offered in Support of the Statute
 
 
 19
 Having found that the Statute discriminates against interstate commerce, the court then sought to determine whether the State had satisfied its burden of "`justify[ing] it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake.'" Id. at *11 (quoting Hughes v. Oklahoma, 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979)). The State asserted two local benefits in its effort to survive strict scrutiny: (1) the prevention of cigarette sales to minors, and (2) the prevention of untaxed cigarette sales. Id. at *18.
 
 1. Direct Sales of Cigarettes to Minors
 
 20
 The State argued to the district court that the Statute would reduce cigarette sales to minors because it requires face-to-face transactions in which sellers can verify the purchaser's age. The court rejected this assertion, finding that the State did not demonstrate "(1) that minors use direct sales channels to a significant degree to acquire cigarettes and, thus, that any material benefit will accrue from the statute; or (2) that the State has no less discriminatory means available to reduce smoking among minors." Id. at *18. In concluding that the Statute would not meaningfully address the problem of underage smoking, the court emphasized "loopholes" in the Statute that it found "fatal to its effectiveness." Id. at *20. The court identified these loopholes as: (1) the four-carton delivery exception; (2) sales made by Indian nations; and (3) shipments made by the United States Postal Service.
 
 
 21
 As noted above, the district court interpreted the delivery exemption to permit local businesses to deliver cigarettes to New York consumers while prohibiting out-of-state sellers from doing the same. The district court construed this to be a loophole because, under its interpretation of the exemption's language and effect, minors still would be able to purchase cigarettes for home delivery — and avoid the age verification of a face-to-face transaction — by ordering cigarettes from local brick-and-mortar vendors utilizing their own delivery services.
 
 
 22
 As to sales by Indian nations, the court stated that they represent a "de facto exemption" because "Indians living on-reservation are not subject to New York excise or sales taxes, and New York does not require retailers on Indian reservations to collect and remit to the State excise and sales taxes owed by such retailers' non-Indian customers." Id. at *7. As a result, the court was "persuaded that no enforcement efforts under [the Statute] will be directed to direct sellers on Indian reservations." Id. at *8.
 
 
 23
 With respect to cigarette shipments by the United States Postal Service, the court observed that "the Postal Service, not the states, has exclusive authority to designate what can and cannot be sent through the mails." Id. at *9. The court was therefore similarly "persuaded that the Postal Service will not and cannot assist in enforcement of [the Statute]." Id. n. 17. The district court concluded that, absent the ability to restrict deliveries by the Postal Service, the Statute would be ineffective in preventing deliveries of cigarettes to minors. Id.
 
 
 24
 These loopholes, coupled with the court's finding that the State failed to show that minors purchased cigarettes to any significant degree by direct shipment, led the court to conclude that the Statute was not sufficiently tailored to achieve the goal of reducing direct cigarette sales to minors. Id. at *20. The court also concluded that the State had not demonstrated that less discriminatory means were unavailable because "there [was] no evidence in the record that New York has developed or tried any alternative less discriminatory means of preventing minors from obtaining cigarettes through direct sales channels rather than completely banning these sales." Id. at *21.
 
 2. Sale of Untaxed Cigarettes
 
 25
 The State also argued to the district court that one of the Statute's purposes is to require purchasers, by virtue of the face-to-face transaction, to pay the state excise tax. The State claims that the high excise tax decreases demand for cigarettes and thereby protects the health of New York consumers. The district court credited the State's argument, finding that the evidence "demonstrated that an increase in the price of cigarettes will lead to a decrease in the demand for cigarettes." Id. at *25. The court concluded, however, that the State failed to show that the Statute would advance this "worthy goal" or that no less discriminatory means were available. Id. at *25. Citing the loopholes discussed above, the court concluded that the State did not satisfy its "burden of demonstrating that [the Statute] will effect the benefit of reducing smoking through the maintenance of high cigarette prices" because "Indian retailers can and will continue to sell cigarettes by direct sales to New York consumers," and because the Statute "cannot be enforced against the U.S. Postal Service." Id. at *26.
 
 
 26
 The court also found that the Statute failed strict scrutiny because the State did not demonstrate a lack of less discriminatory means for collecting the cigarette excise tax. Id. The court explained that the New York State Department of Taxation and Finance "has chosen not to make any effort to collect taxes on cigarettes sold from out-of-state to New York consumers by telephone, mail and Internet." Id. As an example of available alternative means for collecting cigarette excise taxes, the court described the scheme adopted in California for the collection of taxes and concluded that "[t]he evidence shows that there are other nondiscriminatory alternatives to a complete ban on the direct sale of cigarettes." Id. at *28. The court then declared that the Statute fails strict scrutiny and permanently enjoined its enforcement. Id.
 
 III. The Pike Balancing Test
 
 27
 After concluding that the Statute discriminates on its face and in effect, and thus fails strict scrutiny, the district court also evaluated the Statute under the more permissive balancing test we apply to nondiscriminatory statutes that "regulate[ ] even-handedly to effectuate a legitimate local public interest," Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). Under this test, discussed in full below, a nondiscriminatory statute that regulates even-handedly to effectuate a legitimate local concern "will be upheld unless the burden [it] impose[s] on such commerce is clearly excessive in relation to the putative local benefits." Id. Referring to its analysis under strict scrutiny, the court restated its earlier conclusion that the State "ha[s] not proved that [the Statute] will effect [its] wholly laudable goals," and determined that "[o]n balance, then, although `designed for a salutary purpose,' [the Statute] `furthers the purpose so marginally, and interferes with commerce so substantially, as to be invalid under the Commerce Clause.'" Id. (quoting Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 670, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981)). The court therefore concluded that the Statute also fails the Pike balancing test.
 
 
 28
 This timely appeal followed.
 
 DISCUSSION
 I. Legal Standard
 
 29
 The Commerce Clause grants to Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. Art. I, § 8, cl.3. The Clause "has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on [interstate] commerce." South-Central Timber Dev., Inc., v. Wunnicke, 467 U.S. 82, 87, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984); see also Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 349-50, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Thus, although the Clause is phrased as an affirmative grant of congressional power, it is well established that it contains a negative or "dormant" aspect that "denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." Oregon Waste Sys., Inc. v. Dep't of Envt'l Quality, 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). The fundamental objective of the dormant Commerce Clause is to "preserv[e] a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." Gen. Motors Corp. v. Tracy, 519 U.S. 278, 299, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997).
 
 
 30
 In reviewing whether a statute violates the dormant Commerce Clause, the "threshold" question we consider is "whether a state or local government is `regulating.'" United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., 261 F.3d 245, 254 (2d Cir.2001) (citing C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 389, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994)), cert. denied, 534 U.S. 1082, 122 S.Ct. 815, 151 L.Ed.2d 699 (2002). If a statute "regulates," then the second question we examine is whether the statute, in "regulating," "affects interstate commerce." United Haulers, 261 F.3d at 254. Finally, if a state regulation "affects" interstate commerce, we must determine "whether the regulation discriminates against interstate commerce or regulates evenhandedly with incidental effects on interstate commerce." Id. at 255 (internal citations omitted).
 
 
 31
 "[A] state regulates when it exercises governmental powers that are unavailable to private parties," such as the imposition of civil or criminal penalties to compel behavior. United Haulers, 261 F.3d at 255. Many forms of regulation have economic effects that extend beyond the regulating state; a state regulates interstate commerce for Commerce Clause purposes only when the regulation "affects interstate commerce," id. at 254, in a manner either that (i) discriminates against interstate commerce, or (ii) imposes burdens on interstate commerce that are incommensurate with putative local gains.
 
 
 32
 "Legislation that causes certain out-of-state companies to cease selling in a particular state will not violate the dormant Commerce Clause as long as other out-of-state suppliers `will ... promptly replace[ ]' the goods that would have been sold by the companies that cease selling in state." Exxon Corp. v. Maryland, 437 U.S. 117, 127, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978). Accord Tracy, 519 U.S. at 299, 117 S.Ct. 811 (stating that the purpose of the dormant Commerce Clause is to "preserv[e] a national market for competition"). Discrimination against commerce itself occurs when a statute (i) shifts the costs of regulation onto other states, permitting in-state lawmakers to avoid the costs of their political decisions, Nat'l Elec. Mfrs' Ass'n v. Sorrell, 272 F.3d 104, 108 (2d Cir.2001); accord United Haulers, 261 F.3d at 261 (stating that a statute "discriminates" when it "hoards local resources in a manner that favors local businesses"), (ii) has the practical effect of requiring out-of-state commerce to be conducted at the regulating state's direction, Sorrell, 272 F.3d at 110, or (iii) alters the interstate flow of the goods in question, as distinct from the impact on companies trading in those goods, Exxon, 437 U.S. at 127, 98 S.Ct. 2207.
 
 
 33
 Regulations may discriminate unconstitutionally against interstate commerce on their face and in their effect. If a regulation "evince[s]" its discriminatory purposes, or unambiguously discriminates in its effect, it almost always is "invalid per se." Sorrell, 272 F.3d at 108. Statutes that "evince" discrimination are scrutinized strictly, i.e., "the burden falls on the State to justify [the discrimination] both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." Hunt, 432 U.S. at 353, 97 S.Ct. 2434. The party challenging the validity of a statute bears the burden of showing that it is discriminatory and if "discrimination against commerce... is demonstrated, the burden falls on the State to justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." Id.
 
 
 34
 A statute that does not on its face discriminate also may run afoul of the dormant Commerce Clause if, in advancing a legitimate local purpose, it imposes burdens on interstate commerce greater than the local benefits secured. Significantly incommensurate burdens on interstate commerce for the putative local purpose sought to be advanced raise a suspicion of local preference. Such statutes, although not strictly scrutinized, are evaluated under the balancing test articulated in Pike. The Pike test evaluates whether the statute's burdens on interstate commerce are "clearly excessive in relation to the putative local benefits." Pike, 397 U.S. at 142, 90 S.Ct. 844.
 
 
 35
 This balancing test, however, does not invite courts to second-guess legislatures by estimating the probable costs and benefits of the statute, nor is it within the competency of courts to do so. An "excessive" burden "in relation to" putative benefits, we elaborated in Sorrell, is a burden on interstate commerce that is "different from" the burden imposed on intrastate commerce. 272 F.3d at 109 (stating that, "to run afoul of the Pike standard, the statute ... must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce"). Under Sorrell, a burden that seems incommensurate to the statute's gains survives Pike as long as it affects intrastate and interstate interests similarly — the similar effect on interstate and intrastate interests assuaging the concern that the statute is designed to favor local interests.
 
 
 36
 We review de novo whether a statute as a matter of law discriminates on its face or in its effect. Whether a statute discriminates impermissibly against interstate commerce is a mixed question of law and fact that we also review de novo. Scribner v. Summers, 84 F.3d 554, 557 (2d Cir.1996) (stating that "the de novo standard is equally applicable to so called mixed questions of law and fact").
 
 II. Analysis of the Statute
 A. Facial Discrimination
 
 37
 The State argues that the district court erred in finding that the Statute facially discriminates against interstate commerce. We agree.
 
 
 38
 The court articulated two bases for its finding of facial discrimination: that the Statute (1) limits retail cigarette sales to in-state, face-to-face transactions, and (2) permits in-state brick-and-mortar businesses to circumvent the Statute's prohibition on delivering cigarettes to residences, causing the Statute's burdens to fall almost exclusively on out-of-state cigarette sellers. As we explain below, however, neither the Statute's closure of a sales channel for retail cigarette sales nor the Statute's delivery exemption discriminates against interstate commerce, facially or otherwise.
 
 
 39
 1. Limiting Sales to In-State, Face-to-Face Transactions
 
 
 40
 The district court stated that although the Statute's "prohibitions apply to all direct sellers, the law, on its face, discriminates against interstate commerce by requiring that retail sales take place only in-state." Santa Fe, 2001 WL 636441, at *13. This determination is flawed in two respects. First, the district court erred in finding "facial" discrimination based upon its interpretation of the Statute's effects. Second, the district court concluded that the Statute is invalid in large part based upon its analogy to a significantly different statute in an inapposite case, C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994).
 
 
 41
 First, the district court conducted a "facial" analysis by examining the Statute's effects, thereby conflating two of the three inquiries relevant to determining whether a challenged statute or regulation discriminates against interstate commerce. The court stated that the Statute "requir[es] that retail sales take place only in-state," Santa Fe, 2001 WL 636441, at *13. The Statute by its terms, however, does not impose such a requirement; it merely prohibits cigarette sellers from shipping, and common and contract carriers and others from transporting, cigarettes directly to New York consumers. Therefore, the court's determination that the Statute forces all retail sales of cigarettes to occur in the state can only be the result of its interpretation of the Statute's operation, or effect, rather than its terms.
 
 
 42
 Second, in reaching its conclusion the court relied solely on C & A Carbone, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399. This reliance was misplaced because Carbone is easily distinguishable from the case at bar. Carbone involved a local ordinance that by its terms required all solid waste leaving the municipality to be processed at a single designated facility in the town. Id. at 386-87, 114 S.Ct. 1677. This requirement applied to all other solid waste processing facilities regardless of their location, i.e., all solid waste leaving the municipality had to be processed at the designated in-town facility whether it came from out-of-state facilities, in-state facilities, or even other in-town facilities. Id. at 390, 114 S.Ct. 1677. The stated purpose of the ordinance was to finance the $1.4 million it cost to construct the facility. Id. at 386-87, 114 S.Ct. 1677. This brief recitation of Carbone's facts demonstrates its inapplicability to our case.
 
 
 43
 The ordinance in Carbone discriminated on its face against commerce because, although it applied to all other solid waste processing facilities, it favored, in a blatantly protectionist manner, one particular local facility to the detriment of all others. Id. at 391, 114 S.Ct. 1677 ("The flow control ordinance discriminates, for it allows only the favored operator to process waste that is within the limits of the town."). Thus, the ordinance did not regulate all processing facilities evenhandedly because it singled out for preferential treatment one local facility. That distinction demonstrated its facial discrimination. In contrast, the Statute at issue here does not by its terms make any such distinction; it does not on its face prefer either a particular in-state direct shipper of cigarettes or in-state direct shippers generally. Rather, by its terms, the Statute regulates evenhandedly the sale of cigarettes to New York consumers by all direct shippers and transporters regardless of where they are located.
 
 
 44
 The court cited Carbone for the proposition that "a law may be discriminatory even though it limits activities of in-state as well as out-of-state business." Santa Fe, 2001 WL 636441, at *13. While the Court in Carbone did note that "[t]he ordinance is no less discriminatory because in-state or in-town processors are also covered by the prohibition," 511 U.S. at 391, 114 S.Ct. 1677, the district court here failed to recognize that this statement was made within the context of the Court's analysis of the ordinance's discriminatory effects. Id. at 390-91, 114 S.Ct. 1677.
 
 2. The Delivery Exception
 
 45
 The district court's second basis for finding facial discrimination is the so-called delivery exception of subdivision two. Santa Fe, 2001 WL 636441, at *13. Again, the court erred because it relied on the exception's effect, rather than its terms, in reaching its conclusion. The court found that "the statute discriminates on its face against interstate commerce by providing a delivery exemption for New York brick-and-mortar businesses with their own delivery services." Id. at *14. The exception, on its face, does no such thing. Instead, it permits any person, other than a common or contract carrier, to transport up to four cartons of cigarettes at any one time to any one person in New York State. N.Y. Pub. Health Law § 1399-ll (2). Whether the district court is correct regarding which businesses would and would not be able to take advantage of the exception, and therefore whether it discriminates against interstate commerce, is also a question of the exception's effect.
 
 
 46
 Santa Fe claims that "the cases finding facial discrimination do not depend on formalisms such as the particular language a statute uses to work its discrimination." Santa Fe is mistaken. The cases cited by Plaintiffs undermine their contention because all do, in fact, rely on "the particular language" of the statute or regulation at issue. In South-Central Timber, the statute, as characterized by B & W, "require[d] that timber taken from state lands be processed within the state." (emphasis added). Thus, the "particular language" of the statute demonstrated its facial discrimination because by its very terms it made a geographical distinction in favor of in-state businesses by requiring that a commercial activity be conducted within the state. The same is true with the remaining cases cited by the Plaintiffs. See SSC Corp. v. Town of Smithtown, 66 F.3d 502 (2d Cir. 1995) (finding facial discrimination where flow ordinance required all town waste be directed to a single local disposal facility); Stephen D. DeVito, Jr. Trucking, Inc. v. Rhode Island Solid Waste Management Corp., 770 F.Supp. 775, 783 (D.R.I.) (finding facial discrimination where regulation required that all waste collected in the state be processed by in-state facilities), aff'd, 947 F.2d 1004 (1st Cir.1991).
 
 
 47
 The Statute at issue in this case does not on its face limit any commercial activity to in-state or local transactions. Instead, by its terms, the Statute prohibits all direct shipments of cigarettes to New York consumers, whether the direct shippers be located within or without the state, with the limited exception that any person, again whether located within or without the state, may transport to a New York consumer up to four cartons of cigarettes by means other than that of a common or contract carrier. We decline to look beyond the "particular language" of the Statute in determining whether it is facially discriminatory because to do so would collapse the facial and effects analyses into one inquiry. We conclude that no reading of the language of the Statute supports the conclusion that it discriminates against interstate commerce on its face.
 
 B. Discrimination in Effect
 
 48
 A statute or regulation may also be subject to strict scrutiny if it discriminates against interstate commerce in effect. Wyoming v. Oklahoma, 502 U.S. 437, 455, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992). The district court concluded that in addition to facial discrimination, the Statute also discriminates against interstate commerce in effect. Santa Fe, 2001 WL 636441, at *16-17. We disagree.
 
 
 49
 The court articulated the same two bases for its conclusion that the Statute in effect is discriminatory: (1) the retail cigarette market is effectively limited to in-state businesses, and (2) the delivery exception is likewise effectively limited to in-state brick-and-mortar outlets.
 
 
 50
 1. Limiting Sales to In-State, Face-to-Face Transactions
 
 
 51
 Following its citation to the Statute, the district court observed that "[t]he only way an out-of-state seller could legally sell retail cigarettes to New York consumers under [the Statute] is to establish a brick-and-mortar outlet in New York". Id. at *16. The district court then credited the Plaintiffs' testimony that "establishing in-state brick-and-mortar outlets by plaintiffs would be `unworkable' and `uneconomic,'" and therefore the court concluded that "the effect of [the Statute] is to eliminate out-of-state direct sales retailers from the market by requiring face-to-face, in-state retail sales only." Id. (internal citation omitted). Both the court's reasoning and conclusion are flawed in a number of respects.
 
 
 52
 First, even assuming the district court is correct that "[t]he only way an out-of-state seller could legally sell retail cigarettes to New York consumers ... is to establish a brick-and-mortar outlet in New York," id., the same is true for in-state direct shippers. Thus, that consequence applies evenhandedly to both out-of-state and in-state direct cigarette shippers and therefore does not discriminate against those located outside New York State.
 
 
 53
 Second, even if the Plaintiffs' evidence did demonstrate that it would be "unworkable" and "uneconomic" for them to establish brick-and-mortar outlets in New York, that is insufficient to establish a discriminatory effect. See Exxon, 437 U.S. at 127, 98 S.Ct. 2207 (finding that evidence which showed that at least three companies would be unable to continue doing business in the state as a result of the statute at issue did not constitute an impermissible burden on interstate commerce). "The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." Id. at 126, 98 S.Ct. 2207.
 
 
 54
 Moreover, nothing in the record suggests that any alleged hardship would be borne disproportionately by out-of-state direct cigarette shippers. In other words, an in-state direct shipper of cigarettes may well face the same difficulties as the out-of-state shipper. For instance, an individual or business operating an Internet, phone, or mail order direct cigarette sale business in New York State would also be required to establish a brick-and-mortar outlet in order to sell retail cigarettes directly to consumers. The Plaintiffs, who bear the burden of showing a discriminatory effect, have not shown that establishment of a brick-and-mortar outlet would not also be "unworkable" and "uneconomic" for an in-state direct shipper. Rather, they simply rely on evidence demonstrating that they themselves would face significant difficulties in establishing a retail outlet in New York.
 
 
 55
 The fact that these particular Plaintiffs may be priced out of the retail cigarette market does not establish a discriminatory effect. As the Exxon Court noted, "[t]he source of the consumers' supply [of petroleum] may switch from [one group of suppliers to another], but interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another." Id. at 127, 98 S.Ct. 2207. This is so because "the Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." Id. at 127-28, 98 S.Ct. 2207.
 
 
 56
 Third, the district court's conclusion that "the effect of [the Statute] is to eliminate out-of-state direct sales retailers from the market by requiring face-to-face, in-state retail sales only," Santa Fe, 2001 WL 636441, at *16, is only partially accurate: the effect of the Statute is to eliminate all sales of cigarettes to New York consumers that do not involve face-to-face sales or the transportation of fewer than four cartons of cigarettes to any one consumer. Indeed, that is the goal of the Statute. Thus, the Statute merely prohibits one manner in which cigarettes could otherwise be sold to New York consumers, namely through direct shipments. "We cannot ... accept [Plaintiffs'] underlying notion that the Commerce Clause protects the particular structure or methods of operation in a retail market." Exxon, 437 U.S. at 127, 98 S.Ct. 2207.
 
 
 57
 Fourth, the district court's citations to Halliburton Oil, 373 U.S. at 72, 83 S.Ct. 1201, and South-Central Timber, 467 U.S. at 100, 104 S.Ct. 2237, for the proposition that "[a] state may not require an out-of-state operator `to become a resident in order to compete on equal terms,'" are misplaced. Santa Fe, 2001 WL 636441, at *16. Halliburton involved a Louisiana statute that imposed a greater tax burden on out-of-state businesses than similarly situated in-state businesses. Id. at 70-71, 83 S.Ct. 1201. The Supreme Court observed that "[i]f Louisiana were the only State to impose an additional tax burden for such out-of-state operations, the disparate treatment would be an incentive to locate within Louisiana ... in order to compete on equal terms." Id. at 72, 83 S.Ct. 1201. The statute challenged in Halliburton, unlike the Statute at issue here, imposed a tax burden on out-of-state businesses but not on their in-state counterparts. Thus, it was discriminatory on its face. In our case, in-state direct shippers would also be required to establish brick-and-mortar outlets in order to sell cigarettes to New York consumers and the Statute therefore is not discriminatory against out-of-state direct sellers.
 
 
 58
 In South-Central Timber, the Court stated that it "view[s] with particular suspicion state statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere." 467 U.S. at 100, 104 S.Ct. 2237 (quoting Pike, 397 U.S. at 145, 90 S.Ct. 844). In that case, Alaska imposed a requirement that all timber taken from lands within the state be processed in the state prior to exportation. Id. at 84, 104 S.Ct. 2237. The Court in South-Central Timber characterized the regulation as "a naked restraint on export of unprocessed logs." Id. at 99, 104 S.Ct. 2237. The Statute challenged here is not analogous to the regulation in South-Central Timber because (1) it does not mandate that out-of-state businesses conduct a given commercial activity within New York State; (2) it does not restrain the flow of goods into New York; and (3) it does not distinguish between out-of-state and in-state direct shippers. It merely requires that cigarettes sales to New York consumers be conducted in such a way that age can be verified and tax collected, a requirement that applies to all direct shippers of cigarettes wherever they may be located.
 
 
 59
 Finally, and perhaps most importantly, the Statute at issue neither impedes nor obstructs the flow of cigarettes in interstate commerce. Cigarettes will continue to flow into New York State in the same manner they always have. The Statute does not prohibit New York consumers' access to cigarettes; again, it merely requires that they purchase cigarettes in a manner that allows the seller to verify the buyer's age and to collect the state excise tax. As in Exxon, "[t]he crux of [Plaintiffs'] claim is that, regardless of whether the State has interfered with the movement of goods in interstate commerce, it has interfered `with the natural functioning of the interstate market either through prohibition or through burdensome regulation.'" 437 U.S. at 127, 98 S.Ct. 2207 (quoting Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 806, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976)). The Supreme Court in Exxon rejected that argument, as do we here.
 
 2. Delivery Exception
 
 60
 The district court also found that the delivery exception has a discriminatory effect. Santa Fe, 2001 WL 636441, at *16. We disagree with this conclusion as well. The State reiterates on appeal its argument that the exception only permits individual consumers, rather than brick-and-mortar retailers, to transport up to four cartons of cigarettes. We reject this restrictive interpretation and agree with the district court that the delivery exception applies to all transporters of cigarettes, except common or contract carriers. In reaching this conclusion, we adopt the district court's observation that there "is nothing in the language of the statute that limits [the exemption] to consumers. If the Legislature had wanted to restrict the exemption [only] to individual consumers..., it could easily have defined the exemption accordingly." Santa Fe, 2001 WL 636441, at *14.
 
 
 61
 Subdivision two prohibits the "transport" of cigarettes by common or contract carriers to anyone in New York other than licensed cigarette tax agents, licensed dealers, export warehouse proprietors, customs bonded warehouses, or state and federal officials acting in furtherance of their duties. This subdivision also prohibits the "transport" of cigarettes by "any other person" to anyone other than persons in the permitted categories set out in the previous sentence. However, with respect to "any other person," subdivision two creates an exception for the "transporting" of "not more than eight hundred cigarettes at any one time to any person in this state." Subdivision one prohibits "any person engaged in the business of selling cigarettes" from "ship[ping] or caus[ing] to be shipped" any quantity of cigarettes to "any person" in New York who is not included in one of the permitted categories.
 
 
 62
 Judge Cabranes posits that subdivision one, which prohibits shipping, somehow limits the reach of subdivision two's "transporting" exception to individual purchasers of cigarettes. He does so despite the apparently broad applicability of subdivision two to any person other than a common or contract carrier by distorting the commonly accepted meaning of "ship," so that it means the same thing as "transport." The first two definitions of "ship" listed in a commonly accepted dictionary are "to place or receive on board of a ship for transportation by water ..." and "to cause to be transported." Webster's Third New International Dictionary 2096 (1993). Both definitions connote one actor causing another to transport something. The action of a retailer who drives her delivery van to a long-term customer's house does not fall comfortably within either definition. We would not say of this retailer, "she shipped 800 cigarettes to Mr. Jones in her delivery van." Instead we would say that the retailer transported or carried the cigarettes to her customer. See id. at 2430 (listing "carry" as a synonym for "transport").
 
 
 63
 Because Section 1399-ll is a penal statute, one should not read "ship" in such a distorted fashion. Judge Cabranes' reading would subject to criminal liability, see N.Y. Pub. Health L. § 1399-ll (5), small retailers who, in reliance on the common sense meaning of "ship" as it is used in subdivision one and in subdivision two's exception, carry small quantities of cigarettes to customers in their own delivery vans.
 
 
 64
 The district court found, and we agree, that the organization representing grocery stores in New York supported Section 1399-ll based, in part, on its understanding that a de minimis exception existed for the transportation of small quantities of cigarettes by cigarette sellers. See Santa Fe, 2001 WL 636441, at *14 & n. 25 (citing letter dated July 18, 2000, from Michael Rosen, Vice President and General Counsel of the Food Industry Alliance, to James M. McGuire, Counsel to the Governor, Pl.Ex. 211, Tab 32). Thus, it is probable that individual grocers would adopt our understanding of the statute and, under Judge Cabranes' interpretation, be subject to prosecution. Finding no basis for the State's interpretation of the subdivision two exception, we reject that interpretation.
 
 
 65
 Although we agree with the district court's interpretation of the delivery exception, for the reasons discussed below, we find that the exception does not in effect discriminate against interstate commerce. The district court credited the testimony of Robin Sommers, the President and Chief Executive Officer of Santa Fe, who, according to the district court, testified "that it is not economically feasible for interstate companies to make deliveries to New York customers using their own trucks." Id. The court also credited the testimony of an expert for the Plaintiffs who explained that
 
 
 66
 doing the delivery themselves just means that they are becoming a common carrier [and] economically they have to have the same [cost]-structure as a common carrier in order to compete in-state. If for some reason or another they can't deliver in the state at a cost that is similar to the common carrier, if they have to have a courier come from the retailer who is employed by the retailer, then make a face-to-face transaction at the house, that is the same as a ban because that's going to be cost-prohibitive. That's going to be, you can always get the same effect as a ban by making something so costly that nobody is going to do it.
 
 
 67
 Id. The court then stated, quoting Hunt, 432 U.S. at 350-51, 97 S.Ct. 2434, that "the statute's consequence of raising the costs of doing business in the New York market for interstate sellers, while leaving those of their New York counterparts unaffected,... has the practical effect of not only burdening interstate sales ... but discriminating against them." Santa Fe, 2001 WL 636441, at *17 (alterations omitted). The district court's conclusion is erroneous.
 
 
 68
 First, the exercise of the delivery exception does not leave "unaffected" the Plaintiffs' New York counterparts. The Plaintiffs' in-state counterparts are not New York brick-and-mortar retail outlets that sell cigarettes; rather, they are non-brick-and-mortar sellers who ship cigarettes directly to New York consumers following purchases made by Internet, telephone, or mail order. See Ford Motor Co. v. Texas Dep't of Transp., 264 F.3d 493, 500 (5th Cir.2001) ("The [Supreme] Court's jurisprudence finds discrimination only when a State discriminates among similarly situated in-state and out-of-state interests.").
 
 
 69
 Second, in order to show a discriminatory effect on interstate commerce, the Plaintiffs must demonstrate that the Statute confers on their in-state counterparts a competitive advantage. The Plaintiffs cannot satisfy this burden merely by showing the difficulties they themselves would face in their efforts to continue selling cigarettes directly to New York consumers under the terms of the delivery exception. In other words, it may also not be economically viable for in-state direct shippers to "make deliveries to New York customers using their own trucks." Id. at *16.
 
 
 70
 A similarly situated in-state direct shipper who, for instance, currently receives cigarette orders on his website and then ships cigarettes directly to the buyer's residence, would also be required under the exception to maintain his own fleet of delivery trucks, employ drivers, and undertake any other necessary investment just as would the out-of-state direct shipper. The Plaintiffs have not demonstrated how or in what manner such an undertaking would be less onerous for their in-state counterparts. Even if the Plaintiffs' in-state counterparts include brick-and-mortar retail outlets, the delivery exception would only benefit those that already have a delivery system in place. The Plaintiffs have not introduced evidence indicating what portion of brick-and-mortar retail cigarette sellers currently offer delivery services. Thus, we are unable to conduct a comparative analysis of the advantages and disadvantages of the delivery exception to in-state as opposed to out-of-state sellers even were we to consider in-state brick-and-mortar outlets to be counterparts to the Plaintiffs. One can surely imagine, however, that of all in-state retail cigarette sellers, only a small percentage offer delivery service to their customers.
 
 
 71
 In any event, to the extent that, for instance, a grocery store that currently delivers goods to its customers is permitted to include in a delivery up to four cartons of cigarettes, we find that de minimis advantage to in-state brick-and-mortar retail sellers insufficient to establish a discriminatory effect. See Hunt, 432 U.S. at 349, 97 S.Ct. 2434 ("[N]ot every exercise of state authority imposing some burden on the free flow of commerce is invalid.").
 
 
 72
 Where a state restriction affecting commerce applies evenhandedly to both in-state and out-of-state businesses and does not impede the flow of goods in interstate commerce, the restriction neither discriminates against out-of-state entities nor unjustifiably burdens interstate commerce. For the reasons stated above, we conclude that the Statute is not discriminatory either on its face or in effect but instead has only incidental effects on interstate commerce. We therefore analyze its constitutionality under the test established in Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).
 
 III. The Pike Balancing Test
 
 73
 Pike instructs that "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." 397 U.S. at 142, 90 S.Ct. 844. The Statute at issue passes constitutional muster under Pike because the regulation of the importation and sale of cigarettes, even if this regulation discourages the importation of cigarettes, was recognized by the Supreme Court in Austin v. Tennessee, 179 U.S. 343, 348-49, 21 S.Ct. 132, 45 L.Ed. 224 (1900), as a legitimate exercise of state power in the public interest, id., and because the Statute's burdens on interstate commerce are not excessive relative to its local benefits.
 
 
 74
 The district court's conclusion that the Statute violates the Commerce Clause under Pike scrutiny was based on its determination that the Statute "directly and substantially burdens interstate commerce and isolates New York from the national cigarette market." Santa Fe, 2001 WL 636441, at *29. We have concluded that these determinations are erroneous. As discussed above, the Statute, at most, incidentally affects interstate commerce by prohibiting one method for selling cigarettes to New York consumers. Moreover, the Statute in no way isolates New York from the national cigarette market because it does not obstruct or impede the flow of cigarettes into New York State. Because the Statute's effects on interstate commerce are de minimis, we find that they are not "clearly excessive in relation to the putative local benefits." Pike, 397 U.S. at 142, 90 S.Ct. 844.
 
 
 75
 The parties do not dispute the district court's finding that the State has a legitimate interest in "reduc[ing] minors' access to cigarettes through direct sales channels and ... reduc[ing] cigarette consumption by requiring consumers to pay New York's high excise taxes." Id. at *29. The district court cited evidence submitted by a Plaintiffs' expert showing that in 1999 "1.9% of all surveyed youth smokers who purchased cigarettes did so through the mail." Id. at *18. Although the court cited this evidence in support of its conclusion that the State failed to demonstrate "that minors use direct sales channels to a significant degree," id., we find that because the Statute has only de minimis effects on interstate commerce, the prevention of even this small percentage of cigarette sales to minors constitutes a putative local benefit that is sufficient to survive the Pike balancing test. See Ford, 264 F.3d at 503 ("Consistent with the use of the term `putative' in the Pike balancing, this Court will not `second guess the empirical judgment of lawmakers concerning the utility of legislation).'" (quoting CTS Corp. v. Dynamics Corp., 481 U.S. 69, 92, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987)). Moreover, we are particularly persuaded that this evidence tips the balance in the State's favor in light of the pernicious effects of cigarette smoking and the possibility that purchasers of any age may supply youthful smokers who do not themselves purchase through direct channels.
 
 
 76
 The district court also concluded that the State "demonstrated that an increase in the price of cigarettes will lead to a decrease in the demand of cigarettes." Id. at *25. This local benefit, consisting of lower consumption with concomitant benefits to health, is certainly not outweighed by the Statute's de minimis effect on interstate commerce.
 
 
 77
 With respect to both of these "wholly laudable goals," id. at *29, the district court concluded that neither would be "meaningfully address[ed]" by the Statute because of "loopholes which are fatal to its effectiveness." Id. at *20. We disagree with the weight the court afforded these supposed "loopholes" and find that, to the extent they exist, they are not significant enough to undercut the Statute's effectiveness.
 
 
 78
 A. The Statute's Alleged "Loopholes"
 
 1. The Delivery Exception
 
 79
 The district court cited the delivery exception in its discussion of the loopholes that would permit minors to continue purchasing cigarettes "without an in-store, face-to-face transaction." Id. The court did not expressly indicate in what way or to what extent minors would take advantage of this so-called exception nor did it cite any evidence showing that minors currently avoid face-to-face transactions by making such purchases. We need not make such determinations, however, because we find that even if minors were to purchase cigarettes in this manner, this exception nonetheless furthers one of the Statute's two goals: to reduce demand for cigarettes by requiring that purchasers pay New York's high cigarette excise tax.[2]
 
 2. Sales by Indian Nations
 
 80
 The district court also concluded that the Statute's goals would be undermined by cigarette sales by Indian nations. Id. at *20, *26. The court found that "no enforcement efforts under [the Statute] will be directed to direct sellers on Indian reservations." Santa Fe, 2001 WL 636441, at *8. The court based this determination on a failed attempt by the state to collect excise and sales taxes from on-reservation cigarette sales in 1997, and assertions made by Indian nations upon passage of the Statute at issue that they "would continue to sell and deliver tax-free cigarettes without interference." Id. We find the district court's conclusion both speculative and contradicted by the evidence.
 
 
 81
 As enforcement of the Statute was preliminarily enjoined, the State's resolve to enforce its prohibitions has not yet been tested. Further, the State submitted evidence that, because of Indian sovereignty, the Statute would not apply to "[s]ales and shipments of cigarettes to ... [1] recognized Indian nations or tribes, [2] Indian-run businesses on reservations in New York State, or [3] Indian consumers residing on reservations in New York State." The State did explain, "[h]owever, [that the Statute] do[es] apply to shipments of cigarettes by Indian nations, tribes, and businesses to any person other than recognized Indian nations or tribes, Indian-run businesses on reservations or Indian consumers residing on reservations in New York State." (emphases added).
 
 
 82
 Thus, the State retains significant enforcement powers with respect to Indian-related sales despite the fact that it is prohibited from enforcing the Statute against Indian sellers in the three circumstances noted above. We do not view these narrow limitations on the State's enforcement power as constituting a "loophole" in the Statute so significant as to be "fatal to its effectiveness." Id. at *20. The State argues that it intends to enforce the Statute's provisions against Indian sellers to the extent it is legally able to do so, and we see no reason to doubt the veracity of this contention before the State has had an opportunity to attempt such enforcement. Cf. ILGWU v. Donovan, 722 F.2d 795, 821 (D.C.Cir.1983) ("[C]ourt[s] must be particularly deferential when reviewing an agency's predictive judgments about areas that are within the agency's field of discretion and expertise.").
 
 
 83
 Furthermore, because subdivision two of the Statute penalizes independently entities that deliver cigarettes directly to New York consumers, even if the State chose not to enforce the Statute against Indian sellers themselves, it could without limitation enforce that provision against carriers that transport cigarettes from Indian reservations to New York consumers, thereby effectively cutting off the usefulness of this potential "loophole."
 
 
 84
 3. Deliveries by the United States Postal Service
 
 
 85
 The district court also found that because the State is without authority to dictate what the United States Postal Service may or may not ship, this fact likewise "make[s] the law ineffective in stopping minors from accessing cigarettes," id. at *20, and "prevent[ing] smokers from obtaining lower-priced cigarettes," id. at *26. This conclusion is based on a misinterpretation of the Statute.
 
 
 86
 Subdivision one prohibits "any person" from "ship[ping] or caus[ing] to be shipped" cigarettes to New York consumers directly. N.Y. Pub. Health Law § 1399-ll (1). This means that direct shippers are subject to the Statute's civil and criminal penalties regardless of what means of transport they use to deliver the cigarettes. Subdivision two imposes the same penalties on those entities that transport cigarettes directly to New York consumers. To the extent that the State cannot enforce the Statute against the United States Postal Service, it is only without authority to penalize it for violations of subdivision two. In other words, while the State cannot prosecute the Postal Service itself for transporting cigarettes directly to New York consumers under subdivision two, it can prosecute direct shippers for shipping cigarettes to New York consumers through the Postal Service under subdivision one. Thus, under a proper reading of the Statute, this alleged loophole is not "fatal to its effectiveness," id. at *20, because it is, in practice, nonexistent.
 
 
 87
 For these reasons, we conclude that the Statute's de minimis burden on interstate commerce is not "clearly excessive in relation to the local putative benefits," Pike, 397 U.S. at 142, 90 S.Ct. 844, and that the Statute therefore survives Pike scrutiny.
 
 CONCLUSION
 
 88
 We find that the Statute does not discriminate against interstate commerce and therefore is not subject to strict scrutiny. To the extent that the Statute burdens interstate commerce, that burden is significantly outweighed by the Statute's putative local benefits and therefore does not violate the Commerce Clause. Thus, the judgment of the district court is reversed, with directions to enter judgment for the State.
 
 
 
 Notes:
 
 
 [1]
 The penalty provision of section 1399-ll reads in full:
 Any person who violates the provisions of subdivision one or two of this section shall be guilty of a class A misdemeanor and for a second or subsequent violation shall be guilty of a class E felony. In addition to the criminal penalty, the commissioner may impose a civil fine not to exceed five thousand dollars for each such violation on any person who violates subdivision one or two of this section. The commissioner may impose a civil fine not to exceed five thousand dollars for each violation of subdivision three of this section on any person engaged in the business of selling cigarettes who ships or causes to be shipped any such cigarettes to any person in this state.
 N.Y. Pub. Health Law §§ 1399-ll (5).
 
 
 [2]
 Judge Cabranes contends that if subdivision two allows retailers to deliver small quantities of cigarettes to individual consumers, it cannot survivePike balancing because the exception actually undermines rather than serves the statute's goals. Even assuming, and we do not, that the exception undermines the goals of reducing consumption of cigarettes to minors, it serves the goal of reducing general demand for cigarettes by collection of New York's high excise tax as well as does an in-store sale. Ordinary retailers, whether they sell in the store or by delivery to a home, are required to collect the applicable cigarette taxes. It is much more difficult to collect taxes from consumers who order on the Internet or by telephone.
 
 
 
 89
 JOSÉ A. CABRANES, Circuit Judge, concurring in the judgment on separate grounds:
 
 
 90
 Insofar as the Court holds that the Statute does not violate the dormant Commerce Clause I concur, but I respectfully dissent from the majority's interpretation of the Statute to permit home deliveries by local traditional retailers.
 
 
 91
 The majority opinion rests on an inventive distinction by the District Court between so-called "direct" cigarette sellers and so-called "traditional" or "bricks-and-mortar" cigarette sellers, holding that the Statute prohibits direct sellers from making home deliveries of cigarettes but permits traditional retailers to do so.[1] The majority further holds that the Statute prohibits cigarettes from being delivered to homes by third-party carriers (i.e., trucking and mailing services), but permits cigarettes to be delivered to homes by traditional cigarette sellers' first-party (i.e., proprietary) delivery services. Both distinctions are judicial creations. The Statute itself does not differentiate between different types of cigarette sellers. It instead provides penalties for home delivery of cigarettes by "any person engaged in the business of selling cigarettes." N.Y. Pub. Health Law § 1399-ll (1). The Statute itself also does not even mention — much less distinguish between — third-party and first-party carriers, or in any other way create differential permissibility of cigarette home delivery based on the ownership of the means of transport.
 
 
 92
 The majority provides no support for these confected distinctions, much less for the different legal consequences based on type of cigarette seller and type of transport that flow from these distinctions under the majority's reading of the Statute. I therefore dissent from the majority's reading of the Statute and its reasoning about the Statute's application.
 
 
 93
 I also dissent from the majority's interpretation of the Statute's so-called "delivery exemption" as permitting local cigarette retailers to make home deliveries of cigarettes, and from the majority's conclusion that such favoritism toward local interests — without discernable benefits to the public and in complete abrogation of the Statute's stated purpose of making every cigarette sale a face-to-face sale — would not violate the dormant Commerce Clause. I instead read the exemption as a personal use exemption that (i) permits individuals to take cigarettes home from the store without facing the Statute's civil and criminal penalties for "transporting" cigarettes, and (ii) prohibits "any person engaged in the business of selling cigarettes," N.Y. Pub. Health Law § 1399-ll (1), from delivering cigarettes to a consumer's house, regardless of how that "person" or entity causes the cigarettes to arrive there.
 
 
 94
 Based on a significantly different, plain-text reading of the Statute, I concur in the judgment of the Court that the Statute does not facially discriminate against interstate commerce in violation of the dormant Commerce Clause. I also join the majority in its description of the history and purpose of the Statute and its statement of the relevant law.
 
 
 95
 * * * * * *
 
 
 96
 The Statute and the issues at the heart of this case both are fairly simple. The Statute, N.Y. Pub. Health Law § 1399-ll, requires that all purchases of cigarettes in the State of New York take place through a face-to-face transaction. Face-to-face transactions, according to evidence credited by the District Court and the majority, permit vendors to verify the purchaser's age in ways that on-line or telephone transactions do not — that is, in a face-to-face transaction, the vendor can look at the purchaser to see how old he or she is and can inspect photo identification.
 
 
 97
 Age verification is important to the State of New York not only to discourage underage smoking but also to ensure the State's continued receipt of certain federal block grants that, under the so-called Synar Amendment, go to the State only if it achieves specific targets in reducing cigarette sales to underage consumers. See 42 U.S.C. § 300x-26 (2000). For this reason, New York has an active program of combating underage tobacco sales. This program principally is directed at ensuring vendor compliance with age checks during face-to-face sales. There is no equivalent mechanism for ensuring age verification in cigarette sales that do not take place in person but that instead take place over the telephone or internet. The State also has an interest in promoting face-to-face sales because direct retailers (retailers who sell cigarettes over the telephone or internet), generally fail to collect the State's high per-pack excise tax.
 
 
 98
 The panel unanimously agrees that the State has the authority to regulate the sale of cigarettes to require that all cigarette sales take place through a face-to-face transaction. To summarize the majority's position, which I join, the State may require that all cigarettes sold in New York be sold in face-to-face transactions, even if this regulation means that direct retailers no longer can sell cigarettes to New York consumers, because such a regulation is even-handed as between in-state and out-of-state direct retailers. Furthermore, to whatever incidental extent (if at all) such a regulation would burden the interstate commerce in cigarettes, the burden is outweighed by the regulation's significant public purpose.
 
 
 99
 Where the majority and I part company is on the question of whether the Statute permits traditional retailers — that is, so-called "bricks-and-mortar" retailers that operate stores — to sell cigarettes through non-face-to-face transactions and make home deliveries of cigarettes so purchased. In other words, does the Statute permit traditional retailers to behave as if they were direct retailers, making the non-age-verified sales and home deliveries that the Statute aims to prohibit? The majority believes that it does, but I believe not, based on the text of the Statute.
 
 
 100
 Further, were the Statute to favor traditional retailers in this way, I believe that the Statute would fail the Pike balancing test. It would fail the Pike balancing test not because it would favor one type of retailer over the other — traditional retailers versus direct retailers[2] — but because it would favor in-state interests over out-of-state interests while giving up most of the benefit that the Statute aims to secure.
 
 
 101
 The majority interprets the Statute in a way that would favor local interests because of its interpretation of the terms "ship" and "transport" to permit the delivery of cigarettes to a home only by use of a retailer's own short-haul delivery service (e.g., a delivery man) but not by a commercial transport company or the United States postal service.
 
 
 102
 I read the Statute's plain language to prohibit evenhandedly all non-face-to-face sales and home deliveries of cigarettes by all in-state and out-of-state traditional and direct retailers, including bricks-and-mortar retailers using their own delivery services, the reading of the Statute urged by the State of New York.[3] I conclude that this blanket prohibition would survive the Pike balancing test because it would burden in-state and out-of-state interests equally in furtherance of the Statute's anticipated benefits — reducing minors' access to cigarettes, ensuring continued receipt of federal block grants, and facilitating collection of the state's cigarette excise tax — and would fall within the traditional police power of the states to regulate the sale of tobacco under Austin v. Tennessee, 179 U.S. 343, 21 S.Ct. 132, 45 L.Ed. 224 (1900), as discussed by the majority in Section III of its Discussion.
 
 
 1. Analysis of the Statute's text
 
 
 103
 There is no basis in the text of the Statute upon which to conclude that the so-called "delivery exemption" in Subdivision 2 permits local brick-and-mortar retailers to make home deliveries. When read in conjunction with Subdivision 1, Subdivision 2 proscribes deliveries to homes and residences by any cigarette retailer, including bricks-and-mortar retailers using proprietary delivery services.
 
 
 104
 Subdivision 1 addresses businesses that sell cigarettes. It states, in pertinent part, that "[i]t shall be unlawful for any person engaged in the business of selling cigarettes to ship or cause to be shipped any cigarettes to any person in this state" at their home or residence. N.Y. Pub. Health Law §§ 1399-ll (1) (emphasis added). Subdivision 1 thus plainly prohibits "any person engaged in the business of selling cigarettes" from "ship[ping] or causing to [be] shipped" cigarettes to "any person" at their home or residence. Id.
 
 
 105
 "Ship" means "to transport, or commit for transportation." Webster's New Collegiate Dictionary 781 (1956); see also The American Heritage Dictionary 1130 (2d College ed.1991) ("to send or cause to be transported"). "Ship" also may mean "to take or place on board a ship." American Heritage Dictionary, ante. Because the Statute bars the home delivery of cigarettes, and very few homes in New York state are accessible by water, we need not consider if "ship" here refers to the transport of articles by water. Therefore, "ship" must have the ordinary meanings of "to transport, or commit for transportation" or "to send or cause to be transported."[4]
 
 
 106
 A bricks-and-mortar retailer of cigarettes (the majority does not dispute) is a "person engaged in the business of selling cigarettes." N.Y. Pub. Health Law § 1399-ll (1). A retailer delivering cigarettes to a home — pursuant to a sale and by means of that business's delivery service — would be "transport[ing]" or "send[ing]" them. Therefore, a bricks-and-mortar retailer delivering cigarettes to a home plainly would violate Subdivision 1 of the Statute.
 
 
 107
 Subdivision 2 addresses transportation companies, proscribing them from knowingly delivering cigarettes to a home. It states, in pertinent part, that "[i]t shall be unlawful for any common or contract carrier to knowingly transport cigarettes to any person in this state reasonably believed by such carrier to be" an individual consumer, home or residence. N.Y. Pub. Health Law § 1399-ll (2) (emphasis added). To broaden the prohibition still further, Subdivision 2 adds that it shall be unlawful for "any other person" to do so. Id. (emphasis added).
 
 
 108
 Thus, while Subdivision 1 prohibits businesses from sending cigarettes to an individual, home, or residence, Subdivision 2 prohibits common or contract carriers or "any other person" (presumably including "person[s] engaged in the business of selling cigarettes," which are the subject of Subdivision 1) from "transporting" or delivering cigarettes to an individual, home, or residence. Together, Subdivision 1 and Subdivision 2 (as I read them) work together to prohibit completely the delivery of any cigarettes by any retailer ("person engaged in the business of selling cigarettes") through any instrumentality to any individual, home or residence.
 
 
 109
 Subdivision 2 provides a limited exception that the State of New York argues, and I (in agreement with the position urged by the State) read to be, a personal use exemption. The provision in Subdivision 2 states that "[n]othing in this subdivision shall be construed to prohibit a person other than a common or contract carrier from transporting not more than eight hundred cigarettes at any one time to any person in this state." Id.
 
 
 110
 Subdivision 2's exemption plainly is limited to "this subdivision" — Subdivision 2. By its terms, it plainly does not affect, abrogate, or alter the terms and provisions of Subdivision 1. Therefore, Subdivision 2's exemption does not affect Subdivision 1's proscription against home deliveries by any "person engaged in the business of selling cigarettes," including bricks-and-mortar retailers. It also plainly and by its terms does not affect Subdivision 2's proscription on home deliveries by "common or contract carrier[s]." Reading the Statute as a whole, Subdivisions 1 and 2 create an integrated scheme barring the home delivery of cigarettes by any person engaged in the business of selling cigarettes, including in-state brick-and-mortar retailers, and barring the home delivery of cigarettes by any carrier, but creating a limited exemption only for a "person" who is not "engaged in the business of selling cigarettes," id. at § 1399-ll (1), and also is not a "common or contract carrier," id. at § 1399-ll (2).
 
 
 111
 So what is the effect of the exemption in Subdivision 2? The exemption permits home deliveries of four cartons of cigarettes or fewer by persons that are neither (1) "person[s] engaged in the business of selling cigarettes" (including bricks-and-mortar retailers), nor (2) "common or contract carrier[s]." In other words, it permits home deliveries by private individuals — a private, natural person could bring home four cartons or fewer of cigarettes, or could bring that amount of cigarettes to someone else as a gift, without being subject to the civil and criminal penalties of the Statute. But under the exemption in Subdivision 2, a private, natural person could not even bring four cartons of cigarettes to another's house for payment or other consideration because then he or she would qualify as "person engaged in the business of selling cigarettes," and fall under the prohibitions of Subdivision 1.
 
 
 112
 The majority bases its conclusion that the Statute permits bricks-and-mortar retailers to make direct sales and home deliveries by straining the distinction between "ship or cause to be shipped" in Subdivision 1 and "transport" in Subdivision 2. Relying on a definition of "ship" not found in any dictionary, see text at Note 4, ante, the majority asserts that "ship" only can mean the sending of something via a third-party carrier. Therefore, the majority concludes, Subdivision 1 does not prohibit cigarette retailers from sending cigarettes to a consumer's house in their own trucks; rather, it only prohibits the retailer from putting the cigarettes on another person's truck that delivers the cigarettes to the consumer's house.
 
 
 113
 Reading the phrase "ship or causing to be shipped" to permit home deliveries of cigarettes purchased in non-face-to-face transactions is, in my view, flawed and leads to anomalous, if not illogical, results.
 
 
 114
 First, the plain meaning of "ship" includes, but is in no way limited to, the sending of goods via a third party, as noted above. Moreover, as discussed below, the majority contends that the Statute would permit a bricks-and-mortar retailer located across the country to use its own trucks to deliver cigarettes to consumers in New York.[5] While one ordinarily would not speak of cigarettes delivered from across town by bicycle as having been "shipped," certainly conveying cigarettes by truck from one coast to another would constitute "shipping" them, regardless of the ownership of the trucks.
 
 
 115
 Second, the majority's emphasis on "ship" ignores the fact that the entire statutory phrase is "ship or cause to be shipped." N.Y. Pub. Health Law § 1399-ll (1) (emphasis added). Were "ship" exclusively to mean sending goods via a third party, the phrase "or causing to be shipped" would be surplusage. That the entire phrase is "ship or cause to be shipped" serves to make clear that cigarette sellers are barred both (i) from sending or delivering cigarettes to a residence, and also (ii) from causing any third party to do so.
 
 
 116
 Third, reading the Statute to permit "bricks-and-mortar retailers" to conclude non-face-to-face sales and deliver cigarettes so purchased directly to the consumer's home leads to an illogical result. Relying on the word "ship," but on no other in the Statute, the majority holds (contrary to the interpretation of the Statute urged by any of the parties or by the District Court) that the delivery exemption permits direct retailers of cigarettes — whether in-state or out-of-state — to sell cigarettes via telephone and the internet so long as they use their own trucking services to deliver the cigarettes to consumers' homes (thereby avoiding the prohibition on "ship[ping]" them). See Majority Op. at II.B.2 of the Discussion Section.[6] Thus, according to the majority, the only effect of the Statute's prohibition against "ship[ing]" cigarettes is to require cigarette retailers to use their own trucks instead of third-party carriers for home deliveries. The majority's interpretation that the Statute does not prohibit direct shipments causes the Statute to be without any purpose whatsoever — an absurd result surely not intended by the legislature. Cf. Chapman v. United States, 500 U.S. 453, 476, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (stating the rule that "it [is] unreasonable to believe that the legislator intended to include the particular [proposed interpretation]" if such interpretation leads to an "absurd result" (internal quotation marks and citation omitted)); cf. also People v. Bolden, 81 N.Y.2d 146, 152, 597 N.Y.S.2d 270, 613 N.E.2d 145 (1993) (stating that "courts should not interpret [a statute] in such a way that produces `absurd' results" (citations omitted)).
 
 
 117
 The absurdity is compounded when the majority later states, directly contradicting its earlier interpretation of the delivery exemption, that the Statute makes "direct shippers ... subject to the Statute's civil and criminal penalties regardless of what means of transport they use to deliver the cigarettes." Majority Op. at III.A.3 of the Discussion Section (emphasis in original).[7] So holding, the majority gives the Statute some purpose. But in so doing, it adopts a distinction not contained in the Statute — between direct sellers, on the one hand, and traditional bricks-and-mortar retailers who sell and deliver cigarettes without a face-to-face transaction, on the other. This is a distinction without a difference, and one invented out of whole cloth because the Statute itself addresses only "person[s] engaged in the business of selling cigarettes," not so-called direct and so-called traditional retailers.
 
 
 118
 Justifying its extra-textual differentiation of direct and traditional cigarette sellers, and the conclusion that the Statute permits traditional retailers to make non-face-to-face sales and make home deliveries (thereby functioning exactly like "direct" sellers), the majority points to a letter from a lobbyist to the New York governor's counsel. Majority Op. at II. B.2 of the Discussion Section (citing letter dated July 18, 2000, from Michael Rosen, Vice President and General Counsel of the Food Industry Alliance, to James M. McGuire, Counsel to the Governor). This letter sets forth the lobbyist's understanding that the Statute would permit New York State grocers to continue to make home deliveries of cigarettes.
 
 
 119
 I credit, arguendo, that this letter represents the lobbyist's understanding of the Statute. However, a lobbyist's gloss on a statute is not relevant to a court's interpretation of the statute. Where resort must be had to legislative history at all, the relevant materials are those produced by the appropriate legislative committees. See, e.g. Garcia v. United States, 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) (stating that courts should look only to Committee Reports that "`represent[ ] the considered and collective understanding of those [legislators] involved in drafting and studying the proposed legislation)'" (quoting Zuber v. Allen, 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969)). Even the statements of individual legislators are of dubious authority. Id. In the interpretive schema courts ordinarily apply to statutes, an unsolicited letter by a lobbyist to a member of an executive's staff (not even a legislator) would have no place and no probative value. The foregoing is consistent with the methods of statutory construction followed by the New York State courts.[8]
 
 
 120
 In conclusion, based on the plain language of the Statute as set forth above, and the express purpose of the Statute to require all cigarette purchases in New York State to take place exclusively through face-to-face transactions, I respectfully disagree with the District Court and the majority that the Statute can be read to permit retailers using their own delivery services to deliver cigarettes to homes. I instead adopt the State of New York's argument on the plain language of the Statute that it does not.
 
 
 121
 
 2. The majority's reading of the Statute would cause the Statute to discriminate impermissibly in favor of local interests
 
 
 
 122
 After determining that the Statute permits home deliveries by bricks-and-mortar retailers, the District Court held that the Statute discriminates in effect against interstate commerce because only in-state bricks-and-mortar retailers feasibly could make a large number of home deliveries. The District Court reasoned that the total effect of the Statute was simultaneously to prohibit all out-of-state retailers from shipping cigarettes to New York homes, while permitting certain types of in-state retailers to ship cigarettes to New York homes. Based on this view of the Statute, the District Court reasonably concluded that the Statute effectively closes the state to out-of-state cigarette retailers while permitting in-state retailers to continue to sell cigarettes to consumers in non-face-to-face transactions and deliver them to consumers' homes, in violation of its own stated purpose of eliminating all non-face-to-face transactions. So concluding, the District Court held that the Statute (i) fails the Pike balancing test by imposing a burden on interstate commerce that is not justified by the Statute's putative benefits, and (ii) impermissibly serves as a protectionist measure to privilege New York traditional retailers over direct retailers and over out-of-state traditional retailers.
 
 
 123
 The majority follows the District Court in finding that the delivery exemption of Subdivision 2(i) creates a differential impact on in-state and out-of-state retailers, effectively restricting cigarettes sale to in-state retailers only, while (ii) failing to eliminate non-face-to-face transactions by permitting in-state, traditional retailers to continue such transactions. Yet, the majority concludes that the Statute passes the Pike balancing test.
 
 
 124
 I believe that, were the delivery exemption to permit bricks-and-mortar retailers to sell cigarettes directly and make home deliveries as the majority argues, the Statute would fail the Pike test. The Statute would fail the Pike test if it permitted direct sales and home deliveries by traditional retailers (in effect, in-state retailers) because it would burden interstate commerce while rendering the professed purpose of the Statute illusory, leading to the conclusion that it accomplishes nothing but the protectionist purpose of requiring consumers to purchase cigarettes from in-state traditional retailers.
 
 
 125
 The teaching of the Supreme Court in Minnesota v. Clover Leaf Creamery, 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981), supports my view that the Statute would fail the Pike test if its effect were to permit direct sales and home deliveries only by in-state, traditional retailers. In Clover Leaf, the Supreme Court upheld a Minnesota statute requiring milk to be packaged in biodegradable containers, the effect of which was to favor pulp producers located predominantly in Minnesota and to disadvantage plastics producers located predominantly outside of Minnesota. The Court stated that "[o]nly if the burden on interstate commerce clearly outweighs the State's legitimate purposes does such a regulation violate the Commerce Clause." Id. at 474, 101 S.Ct. 715. Therefore, under Clover Leaf, a statute at the very least must have a "legitimate purpose" before it constitutionally may burden interstate commerce. Here, if, as the majority contends, the Statute were to permit non-face-to-face sales and home deliveries by in-state traditional retailers, the Statute would not have a "legitimate purpose" because it would fail by its own terms in prohibiting such transactions. Therefore, I believe that the majority's reading of the Statute would cause it to discriminate unconstitutionally against interstate commerce because it would favor local interests for no legitimate purpose.
 
 
 
 Notes:
 
 
 [1]
 For consistency with the majority opinion, I adopt this nomenclature
 
 
 [2]
 If the Statute were to discriminate between direct retailers and traditional retailers, without regard to their location, then direct retailers might have an equal protection claim but not a dormant Commerce Clause claim
 
 
 [3]
 The State of New York never argued that the Statute would be constitutional if, as interpreted by the majority, it permitted home deliveries by in-state traditional retailers but not by any other cigarette retailers. Instead, the State argued that the Statute prohibits all home deliveries. In the alternative, the State argued that if this Court were to find that the exemption in Subdivision 2 permits home deliveries by traditional retailers using their own delivery services, that it should sever the exemption from the Statute to preserve the Statute's constitutionality
 
 
 [4]
 The majority, after quoting several standard dictionaries' definitions of "ship," states that the definitions "connote one actor causing another to transport something." Majority Op. at II.B.2 of its Discussion Section. However, this interpretation of "ship" exclusively to require one actor to commit goods to another actor for transport is anad hoc embroiderment by the majority on these standard definitions. No standard definition of "ship," whether cited by the majority or cited separately above, specifies that a third party must transport the goods. It is fully consistent with definitions of "ship" that a party sending goods from one place to another using its own vehicles is "ship[ping]" the goods. The majority's reading of the delivery exemption depends on defining "ship" exclusively to mean sending goods by third party (thereby permitting traditional retailers to make home deliveries with their own vehicles because, absent the use of a third-party service, such deliveries would not be "ship[ments]"). This is a possible meaning of "ship," but it is not the plain or necessary meaning, nor is it the most reasonable meaning in the context of the Statute.
 
 
 [5]
 The majority contends that the Statute does not violate the dormant Commerce Clause because it (under the majority's view) permits traditional retailers located anywhere in the country to ship up to four cartons of cigarettes to the homes of consumers in New York, and therefore the Statute does not favor local traditional retailers with delivery services. Majority Op. at II.B.1 of its Discussion Section. I do not reach the question of whether the Statute would violate the dormant Commerce Clause were it to permit home deliveries by traditional retailers located anywhere in the country because I read the Statute to prohibit home deliveries by "any person engaged in the business of selling cigarettes," including all traditional retailers located anywhere in the United States
 
 
 [6]
 The majority here states that a "direct shipper who ... currently receives cigarette orders on his website and then ships cigarettes directly to the buyer's residence, would also be required under the [delivery exemption] to maintain his own fleet of delivery trucks, employ drivers, and undertake any other necessary investment."Id.
 
 
 [7]
 Thus the majority interprets the Statute (i) to permit all cigarette retailers to make home deliveries of four cartons or fewer as long as they use their own delivery services, Majority Op. at II.B.2 of the Discussion Section, and (ii) to permit only traditional retailers, but not direct retailers, to make home deliveries using their own delivery services,id. at III.A.3 of the Discussion Section. These positions are contradictory — it cannot be true both that the Statute permits only traditional retailers to make home deliveries and that it permits all retailers to make home deliveries.
 
 
 [8]
 The New York Court of Appeals has held that, in questions of statutory interpretation, a court's "analysis begins with the language of the statute. If the terms are clear and unambiguous, the court should construe it so as to give effect to the plain meaning of the words used."Auerbach v. Board of Educ., 86 N.Y.2d 198, 204, 630 N.Y.S.2d 698, 654 N.E.2d 972 (1995) (internal quotation marks and citations omitted). The lobbyist's letter at issue here clearly is not part of the "language of the statute." Id. Where resort must be had to legislative history, the "objective ... is to discern and apply the will of the Legislature, not the court's own perception." Matter of Sutka v. Conners, 73 N.Y.2d 395, 403, 541 N.Y.S.2d 191, 538 N.E.2d 1012 (1989) (emphasis added); see also N.Y. Stat. Ann. § 92(b) (stating that courts are bound to give effect to the intent of the legislature as expressed, first, in the text of the statute and, second, in the "such facts ... as may ... legitimately reveal [legislators' intent]").