OLTRA, INC., Smoke Signals Tobacco, Smokes–Spirits.com, Greystone Enterprises, Inc., Donald McDonald, and Carmen J. Greco, Plaintiffs,

v.

George E. PATAKI, in his official capacity as Governor of the State of New York, Eliot Spitzer, in his official capacity as Attorney General of the State of New York, and Antonia C. Novello, M.D., in her official capacity as Commissioner of Health of the State of New York, Defendants.

No. 03–CV–319S.

United States District Court, W.D. New York.

June 23, 2003.

Joseph F. Crangle, Colucci & Gallaher, P.C., Buffalo, NY, Margaret A. Murphy, Buffalo, NY, James Bikoff, Silverberg, Goldman & Bikoff, Washington, DC, for Plaintiffs.

Stephen F. Gawlik, Assistant Attorney General, Buffalo, NY, for Defendants.

## DECISION AND ORDER

SKRETNY, District Judge.

## I. *INTRODUCTION*

In this case, Plaintiffs challenge the constitutionality of a New York statute that essentially prohibits the shipment and transportation of cigarettes directly to New York consumers. On June 17, 2003, Plaintiffs moved for a Temporary Restraining Order to prevent Defendants from enforcing this statute.

Initially, it is important to consider the specific issues raised by this motion and recognize the procedural posture of this case. Plaintiffs assert six causes of action in this lawsuit. Some of these causes of action involve matters pertaining specifically to Native American tribes. In particular, Plaintiffs allege that the statute violates certain rights reserved to Native Americans under the Indian Commerce Clause, the doctrine of tribal immunity, and certain Indian treaties. However, in support of the present motion, Plaintiffs decided to rely upon only one cause of action: their claim that the statute violates the Dormant Commerce Clause. Because this was the sole claim briefed and argued by the parties, the only question currently before me is whether Plaintiffs are likely to succeed on the merits of that particular cause of action. As such, in resolving this motion, I did not address the issue of whether Plaintiffs are likely to succeed on the merits of their other causes of action, including those claims that pertain specifically to Native American tribes. The merits of those causes of action will be evaluated at an appropriate time in the future.

At this stage, in order to obtain the requested relief, Plaintiffs are required to demonstrate a likelihood that they will succeed on the merits of their Dormant Commerce Clause claim. For the reasons discussed fully below, I find that this claim is unlikely to succeed. As a district judge sitting in the Western District of New York, I am bound to follow precedents established by the United States Court of Appeals for the Second Circuit. In February 2003, that court reviewed a challenge to the statute at issue in the instant case and found that does not violate the Dormant Commerce Clause. Although Plaintiffs argue strenuously that the Second Circuit's decision does not control in this case, I find that argument unpersuasive. In my view, at this stage of the litigation, the Second Circuit's decision essentially resolves the legal issues presented with respect to this particular cause of action.

Plaintiffs' motion raised several complex constitutional issues. After taking the time necessary to carefully consider all of the written submissions, oral arguments, and applicable law, I find that it is unlikely that Plaintiffs will succeed on the merits of their Dormant Commerce Clause claim. For that reason, Plaintiffs' Motion for a Temporary Restraining Order is denied.

## II. *BACKGROUND*

### A. *Legislative Background*

For many years, both Congress and the New York State Legislature have enacted laws aimed at preventing the sale of cigarettes to minors and reducing cigarette consumption by adults.[1] The law at issue in the present case is section 1399–ll of New York's Public Health Law ("the Statute"), which was signed into law by Governor George E. Pataki on August 16, 2000. The Statute provides, in pertinent part, that:

1. It shall be unlawful for any person engaged in the business of selling cigarettes to ship or cause to be shipped any cigarettes to any person in this state who is not: (a) a person licensed as a cigarette tax agent or wholesale dealer . . .; (b) an export warehouse proprietor . . . or an operator of a customs bonded warehouse . . .; or (c) a person who is an officer, employee or agent of the United States government, this state or a department, agency, instrumentality or political subdivision of the United States or this state, when such person is acting in accordance with his or her official duties . . . .

2. It shall be unlawful for any common or contract carrier to knowingly transport cigarettes to any person in this state reasonably believed by such carrier to be other than a person described in paragraph (a), (b) or (c) of subdivision one of this section. For purposes of the preceding sentence, if cigarettes are transported to a home or residence, it shall be presumed that the common or contract carrier knew that such person was not a person described in paragraph (a), (b) or (c) of subdivision one of this section. It shall be unlawful for any other person to knowingly transport cigarettes to any person in this state, other than to a person described in paragraph (a), (b) or (c) of subdivision one of this section. Nothing in this subdivision shall be construed to prohibit a person other than a common or contract carrier from transporting not more than eight hundred cigarettes at any one time to any person in this state.

N.Y. PUB. HEALTH LAW §§ 1399–ll (1)—(2).

Basically, subdivision one of the Statute makes it unlawful to ship cigarettes directly to New York consumers. *See* N.Y. PUB. HEALTH LAW § 1399–ll (1). Subdivision two prohibits the knowing transportation of cigarettes to New York consumers. *See* N.Y. PUB. HEALTH LAW § 1399–ll (2). However, subdivision two also contains a limited exception that allows "a person other than a common or contract carrier" to transport eight hundred cigarettes (four cartons) or less "at any one time to any person in this state." N.Y. PUB. HEALTH LAW § 1399–ll (2).

The Statute includes the following legislative findings: "that the shipment of cigarettes sold via the internet or by telephone or by mail order to residents of this state poses a serious threat to the public health, safety, and welfare, to the funding of health care . . ., and to the economy of the state." N.Y. PUB. HEALTH LAW, ch. 262, § 1.

---

1. A detailed discussion of these legislative efforts may be found in *Santa Fe Natural Tobacco, Inc. v. Spitzer,* No. 00–CIV–7274 (LAP), 00–CIV–7750 (LAP), 2001 WL 636441, at *3–*9 (S.D.N.Y. June 8, 2001).

### B. *The Brown & Williamson Case*

Shortly after the Statute was enacted, three companies filed lawsuits in the United States District Court for the Southern District of New York. These suits were later consolidated into a single action (the *"Brown & Williamson* case"). The plaintiffs in that action were Santa Fe Natural Tobacco Company, Inc., Brown & Williamson Tobacco Corporation, and BWTDirect, LLC (collectively, "the *Brown & Williamson* plaintiffs").[2] They sued various New York State officials, including the Governor, Attorney General, and Commissioner of Health (collectively, "the State"). The *Brown & Williamson* plaintiffs challenged the constitutionality of Public Health Law § 1399–*ll* (the exact same statute at issue in the instant case) under the Commerce Clause and sought to enjoin its enforcement.

On November 13, 2000, the district court issued a temporary restraining order prohibiting the State from enforcing the Statute. Beginning on April 24, 2001, the court conducted a hearing on a motion for a preliminary injunction and a bench trial on the merits. On June 8, 2001, the district court issued an unpublished corrected opinion finding that the Statute violated the Commerce Clause and permanently enjoining its enforcement. *Santa Fe Natural Tobacco Co., Inc. v. Spitzer*, No. 00–CIV–7274 (LAP), 00–CIV–7750 (LAP), 2001 WL 636441 (S.D.N.Y. June 8, 2001).

The State appealed to the United States Court of Appeals for the Second Circuit.

On February 13, 2003, the Second Circuit issued a decision reversing the district court. *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200 (2d Cir. 2003). The appeals court found that the Statute did not violate the Commerce Clause and remanded the case to the district court with instructions to enter judgment in favor of the State. *Id.* at 219. On April 3, 2003, the Second Circuit denied a petition to rehear the appeal *en banc*. On May 2, 2003, the district court entered an order vacating its prior order and granting judgment in favor of the State.[3]

### C. *Present Action's Procedural History*

The plaintiffs commenced the present action on April 17, 2003, by filing a Complaint in the United States District Court for the Western District of New York. Plaintiff Online Tobacco Retailers Association ("OLTRA") is a trade association organized for the purpose of representing the interests of certain retail sales business that transact business "online" via the Internet. (Complaint, ¶ 3). OLTRA's members are located throughout the United States. (Complaint, ¶ 3). Plaintiff Smoke Signals Tobacco Outlet ("Smoke Signals") is an Internet tobacco retailer. (Complaint, ¶ 4).

---

**2.** The first plaintiff listed in the caption of the district court's decision was Santa Fe Natural Tobacco, Inc. The first plaintiff listed in the caption of the Second Circuit's decision was Brown & Williamson Tobacco Corporation. For the sake of convenience, the entire case is referred to herein as the *"Brown & Williamson"* case.

**3.** In addition to the *Brown & Williamson* case, it appears that at least two other legal challenges have been made to the Statute. In April 2003, a group of carriers filed a lawsuit in the Southern District of New York seeking declaratory and injunctive relief against subdivision two of the Statute (the section banning direct transportation of cigarettes). *See New York State Motor Truck Ass'n v. Pataki*, No. 03–CIV–2386 (GBD) (S.D.N.Y.). As far as this Court can determine, that case remains pending in the Southern District. Further, it appears that a lawsuit was recently commenced in New York State court, alleging that the Statute violates the rights of Native Americans. *See* Dan Herbeck, *Second Suit Challenges Cigarette Sales Law*, Buffalo News, June 23, 2003, at B1.

Smoke Signals operates on the Seneca Nation of Indians Cattaraugas Reservation, which is located in Western New York. (Complaint, ¶ 4). Plaintiff Smokes–Spirits.com, Inc. ("Smokes Spirits") is an Internet retailer located in Newport, Kentucky. (Complaint, ¶ 5). Smokes Spirits sells a variety of products online, including cigarettes. (Complaint, ¶ 5). Plaintiff Greystone Enterprises, Inc. ("Greystone") is a Delaware corporation based in Gibsonville, North Carolina. (Complaint, ¶ 6). Greystone sells cigarettes and other tobacco related products through its website. (Complaint, ¶ 6). Smoke Signals, Smokes Spirits, and Greystone are all members of OLTRA. (Complaint, ¶¶ 4–6). Plaintiffs Donald McDonald and Carmen John Greco are disabled adult residents of New York who regularly purchase cigarettes via the Internet. (Complaint, ¶¶ 7–8). All six of the plaintiffs will be referred to herein collectively as "Plaintiffs."

Defendant George E. Pataki is the Governor of the State of New York. Defendant Eliot Spitzer is the Attorney General of the State of New York. Defendant Antonia C. Novello is the New York State Commissioner of Health. All three defendants are sued in their official capacities and will be referred to herein collectively as "Defendants" or the "State."

Plaintiffs' Complaint seeks declaratory and injunctive relief prohibiting Defendants from enforcing the Statute, which they contend is unconstitutional. Specifically, Plaintiffs argue that the Statute violates the following provisions of the United States Constitution: the Indian Commerce Clause, the Supremacy Clause, the Commerce Clause, the Equal Protection Clause, and the Privileges and Immunities Clause.

On June 9, 2003, Defendants filed a Motion to Dismiss the Complaint.[4] On June 17, 2003, Plaintiffs moved for a Temporary Restraining Order, a Preliminary Injunction, and an Expedited Hearing.[5] This Court granted Plaintiffs' Motion for an Expedited Hearing and heard oral argument on the Motion for a Temporary Restraining Order on June 19, 2003. At the conclusion of the oral argument, this Court deemed the matter submitted and reserved decision.

## III. DISCUSSION

### A. Legal Standard

#### 1. Temporary Restraining Order

■ Plaintiffs have moved for a Temporary Restraining Order ("TRO") to bar the State from enforcing the Statute for a limited period of time. During that time, this Court would hear and decide Plaintiffs' Motion for a Preliminary Injunction. There is no dispute that the applicable legal standard for a TRO is as follows. Generally, a party seeking this type of injunctive relief "must show 'a threat of irreparable injury and either (1) a probability [or likelihood] of success on the merits or (2) sufficiently serious questions going to the merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping decidedly in favor of the moving party.'" *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir.2003) (quoting *Time Warner Cable v.*

---

4. The parties are scheduled to appear before this Court on July 15, 2003, for oral argument on this motion.

5. In support of this motion, Plaintiffs filed a memorandum of law, the affirmation of Ali Davoudi, and the affirmation of Michael Klee. In opposition, Defendants filed a memorandum of law and the declaration of Todd M. Kerner.

*Bloomberg L.P.,* 118 F.3d 917, 923 (2d Cir.1997)).

■ However, when the moving party seeks to enjoin government action taken in the public interest pursuant to a statutory or regulatory scheme, that party must satisfy the more rigorous "likelihood of success on the merits" standard and may not resort to the lower "fair ground of litigation" test. *See Forest City Daly Hous., Inc. v. Town of North Hempstead,* 175 F.3d 144, 149 (2d Cir.1999). The Second Circuit has noted that "this exception reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able v. United States,* 44 F.3d 128, 131 (2d Cir.1995).

Therefore, in the instant case, because Plaintiffs seek to prevent the State from enforcing a duly enacted statute, they must demonstrate both a threat of irreparable injury and a likelihood of success on the merits.

With respect to irreparable injury, Plaintiffs argue that enforcement of the Statute will violate their constitutional rights, which they claim is *per se* an irreparable injury. In addition, Plaintiffs filed affidavits stating that enforcement of the Statute will cause them to lose sales revenue and force them to lay off employees.[6] For purposes of the present motion, Defendants elected to concede and this Court is satisfied that Plaintiffs have established a threat of irreparable injury.

As to the likelihood of success on the merits, Plaintiffs assert that they are likely to succeed on all six of their causes of action. However, for purposes of the instant motion, Plaintiffs elected to brief and argue only one of those causes of action: their claim that the Statute violates the Dormant Commerce Clause.[7]

### 2. *Dormant Commerce Clause*

Article I, section 8, clause three of the United States Constitution grants Congress the power "[t]o regulate Commerce ... among the several States ...." U.S. CONST. art. I, § 8, cl. 3. This provision is commonly referred to as the "Commerce Clause." Courts interpreting the Commerce Clause have held that "although the Clause is phrased as an affirmative grant of congressional power, it ... [also] contains a negative or 'dormant' aspect that 'denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce.'" *Brown & Williamson,* 320 F.3d at 208 (quoting *Oregon Waste Sys., Inc. v. Dep't of Envt'l Quality,* 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994)). This negative or dormant aspect of the Commerce Clause is often referred to as the "Dormant Commerce Clause." The Supreme Court has held that the primary purpose of the Dormant Commerce Clause is to "preserv[e] a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *General Motors Corp. v. Tracy,* 519 U.S. 278, 299, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997).

■ When faced with a Dormant Commerce Clause challenge, "the threshold question ... is whether a state or local government is regulating." *Brown & Williamson,* 320 F.3d at 208 (quoting *United*

---

6. Plaintiffs argue that this harm is irreparable because the Eleventh Amendment bars an award of retrospective money damages against the State or these Defendants acting in their official capacities.

7. Therefore, as discussed *supra,* this Court has not addressed the issue of whether Plaintiffs are likely to succeed on the merits of their other causes of action.

*Haulers Ass'n, Inc. v. Oneida–Herkimer Solid Waste Mgmt. Auth.,* 261 F.3d 245, 254 (2d Cir.2001) (internal quotation marks omitted)). If the state is "regulating," the next question is whether the regulation "affects interstate commerce." *Brown & Williamson,* 320 F.3d at 208 (citations omitted). If that question is answered in the affirmative, the final step is to determine "whether the regulation discriminates against interstate commerce or regulates evenhandedly with incidental effects on interstate commerce." *Id.* (citations omitted).

### B. *Analysis*

■ In the present case, there is no dispute that by enforcing the Statute and imposing criminal and civil penalties for violations, New York would be "regulating" for purposes of the Dormant Commerce Clause. *See id.* (noting that a " 'state regulates when it exercises governmental powers that are unavailable to private parties,' such as the imposition of civil or criminal penalties to compel behavior") (citation omitted). Further, it is essentially undisputed that enforcement of the Statute will have at least some effect on interstate commerce. Thus, the real question is whether Plaintiffs are likely to succeed on the merits of their claim that the Statute either (1) "discriminates against interstate commerce" or (2) "imposes burdens on interstate commerce that are incommensurate with putative local gains." *Id.*

#### 1. *Discrimination Against Interstate Commerce*

A statute may discriminate unconstitutionally against interstate commerce in two ways: either on its face or in its effect. *Id.* at 208. In the present case, the parties agree that the Statute does not discriminate against interstate commerce on its face. That is, the Statute's terms are facially neutral because there is no explicit distinction between *intra*state commerce and *inter*state commerce.

■ The issue then is whether the Statute, although facially neutral, "unambiguously discriminates in its effect . . . ." *Id.* at 209. If the Statute discriminates it is almost "invalid *per se* " and will be subjected to strict scrutiny. *Id.* (quoting *National Elec. Mfrs. Ass'n v. Sorrell,* 272 F.3d 104, 108 (2d Cir.2001)); *see also Wyoming v. Oklahoma,* 502 U.S. 437, 455, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992) (holding that a statute may be subject to strict scrutiny if it discriminates against interstate commerce in effect). Under the strict scrutiny standard "the burden falls on the State to justify [the discrimination] both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Brown & Williamson,* 320 F.3d at 209 (quoting *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 349–50, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)).

■ Plaintiffs, as the parties challenging the constitutionality of the Statute, bear the burden of showing that it is discriminatory. *Brown & Williamson,* 320 F.3d at 209 (citing *Hunt,* 432 U.S. at 353, 97 S.Ct. 2434). In the context of the instant motion for a TRO, the question is whether Plaintiffs are likely to succeed in making that showing. Plaintiffs advance two principal arguments in support of their contention that the Statute discriminates against interstate commerce. Both of these arguments will be examined in turn.

##### a. *Absence of Intrastate Direct Cigarette Retailers*

Plaintiffs argue that the Statute discriminates against interstate commerce because the only parties affected by its enforcement are out-of-state businesses that ship cigarettes directly to New York cus-

tomers. They assert that there are no in-state direct cigarette shippers. (That is, that there are no New York businesses that ship cigarettes directly to New York consumers.) Therefore, Plaintiffs contend, no in-state businesses are adversely affected by the Statute. As such, Plaintiffs argue that by essentially limiting New York consumers to face-to-face cigarette purchases, the Statute conveys a competitive advantage to in-state "brick-and-mortar" retailers at the expense of out-of-state direct retailers. This Court finds that Plaintiffs' claim is unlikely to succeed based upon this argument.

The district court in the *Brown & Williamson* case adopted the very argument that Plaintiffs urge upon this Court. However, the Second Circuit reversed the district court, finding that:

> [T]he district court's conclusion that "the effect of [the Statute] is to eliminate out-of-state direct sales retailers from the market by requiring face-to-face, in-state retail sales only," ... is only partially accurate: the effect of the Statute is to eliminate *all* sales of cigarettes to New York consumers that do not involve face-to-face sales or the transportation of fewer than four cartons of cigarettes to any one consumer. Indeed, that is the goal of the Statute.

*Brown & Williamson*, 320 F.3d at 213 (quoting *Santa Fe*, 2001 WL 636441, at *16) (emphasis in original). The appeals court further explained that "the Statute merely prohibits one manner in which cigarettes could otherwise be sold to New York consumers, namely through direct shipments." *Brown & Williamson*, 320 F.3d at 213. The Second Circuit concluded that the district court erred by accepting the plaintiffs' argument that "the Commerce Clause protects the particular structure or methods of operation in a retail market." *Id.* (quoting *Exxon Corp.*

*v. Governor of Maryland*, 437 U.S. 117, 127, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978)).

Further, even assuming *arguendo* that there are no in-state direct cigarette shippers, Plaintiffs' argument is unavailing because its focus is misplaced. Explaining its decision in *Brown & Williamson*, the Second Circuit stated:

> Finally, and perhaps most importantly, the Statute at issue neither impedes nor obstructs the *flow* of cigarettes in interstate commerce. Cigarettes will continue to flow into New York State in the same manner they always have. The Statute does not prohibit New York consumers' access to cigarettes ... it merely requires that they purchase cigarettes in a manner that allows the seller to verify the buyer's age and to collect the state excise tax.

*Brown & Williamson*, 320 F.3d at 214 (emphasis added).

Plaintiffs in the instant case do not, and indeed cannot, argue that the Statute prevents cigarettes from *flowing* into New York through interstate commerce. Rather, they contend that the Statute is discriminatory because it regulates the particular method by which cigarettes move into the state. That is, they object to the Statute because it prevents cigarettes from flowing through interstate commerce directly to New York consumers. However, the Second Circuit addressed this very argument, characterizing it as follows: "[t]he crux of [the plaintiffs'] claim is that, regardless of whether the State has interfered with the movement of goods in interstate commerce, it has interfered 'with the natural functioning of the interstate market either through prohibition or through burdensome regulation.'" *Brown & Williamson*, 320 F.3d at 214 (quoting *Exxon*, 437 U.S. at 127, 98 S.Ct. 2207). The Second Circuit held that "[t]he Supreme Court in *Exxon* rejected that argument, as

do we here." *Brown & Williamson*, 320 F.3d at 214.

Plaintiffs further argue that the Second Circuit's holding in *Brown & Williamson* is not controlling here because it was based upon a "fatal assumption." According to Plaintiffs in the instant case, the *Brown & Williamson* plaintiffs failed to present evidence that Internet retailers compete directly with local brick-and-mortar retailers. In addition, Plaintiffs argue that the record before the Second Circuit did not include evidence relating to the New York market share for direct sales retailers as compared to brick-and-mortar retailers. Plaintiffs assert that this lack of evidence led the Second Circuit to the "fatal assumption . . . that there exist intrastate direct retailers who are adversely affected by this Statute." (Plaintiffs' Memorandum of Law, at p. 11). According to Plaintiffs, the Second Circuit's "[r]eliance upon this fatal assumption led [that court] to apply the incorrect standard of review." (Plaintiff's Memorandum of Law, p. 11). In another part of Plaintiffs' memorandum of law, they assert that the Second Circuit "did not conduct a full Commerce Clause analysis." (Plaintiff's Memorandum of Law, p. 4).

Preliminarily, this Court notes that Defendants filed an affidavit indicating that there is at least one direct cigarette sales business in New York who would be adversely affected by the Statute. (Kerner Declaration, ¶ 4). More important, however, is that this Court must assume that the Second Circuit was satisfied that it had sufficient evidence to rule on the constitutionality of the Statute. That court was (of course) aware that its decision would become binding precedent in each of the district courts located within this Circuit. If the Second Circuit had any question or doubt about the sufficiency of the factual record, it could have issued an unpublished decision or stated that its holding was limited to the specific facts presented or the record developed in that case. The appeals court could also have remanded the case to the district court for further development of the record. However, the Second Circuit decided to resolve the case on its merits, remanding it to the district court with instructions to enter judgment in favor of the State. When faced with Second Circuit precedent squarely addressing the issue at bar, it is not this Court's role to second guess or declare that precedent inapplicable based upon an allegation that its clear holding was based on an allegedly incorrect assumption or underdeveloped factual record.

However, even accepting Plaintiffs' assertion that the Second Circuit made an incorrect assumption, the significance that Plaintiffs place on that "assumption" is overstated. First, it is clear that the Statute applies evenhandedly to both in-state businesses and out-of-state businesses. Both are precluded from shipping cigarettes directly to New York consumers. Second, as discussed *supra*, the reason cited by the Second Circuit as "perhaps" its most important was the fact that the Statute "neither impedes nor obstructs the *flow* of cigarettes in interstate commerce." *Brown & Williamson*, 320 F.3d at 214 (emphasis added). This focus on the flow of goods in interstate commerce is consistent with the Supreme Court's holding in *Exxon Corp. v. Governor of Maryland.* In that case, the plaintiffs challenged a Maryland statute prohibiting producers or refiners of petroleum products from operating retail service stations within Maryland. *Exxon*, 437 U.S. at 119–20, 98 S.Ct. 2207. The plaintiffs in *Exxon* argued that the statute discriminated against interstate commerce because there were no Maryland-based producers or refiners and, as such, the burden of the statute fell solely on interstate companies. *Id.* at 125, 98 S.Ct. 2207. The Supreme Court rejected

this argument, holding that the fact that the statute's burdens fell solely upon interstate companies "[did] not lead, either logically or as a practical matter, to a conclusion that the State is discriminating against interstate commerce at the retail level." *Id.*

At oral argument, Plaintiffs' counsel asserted that *Exxon's* footnote 16 distinguishes that case from the instant one. That footnote reads as follows:

> If the effect of a state regulation is to cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market ... the regulation may have a discriminatory effect on interstate commerce. But the Maryland statute has no impact on the relative proportions of local and out-of-state goods sold in Maryland and, indeed, no demonstrable effect whatsoever on the interstate flow of goods. The sales by independent retailers are just as much a part of the flow of interstate commerce as the sales made by the refiner-operated stations.

*Id.* at 126, n. 16, 98 S.Ct. 2207. Plaintiffs' argument is unpersuasive because the Second Circuit already determined that "the Statute at issue neither impedes nor obstructs the flow of cigarettes in interstate commerce ... it merely requires that [New York consumers] purchase cigarettes in a manner that allows the seller to verify the buyer's age and to collect the state excise tax." *Brown & Williamson*, 320 F.3d at 214. That is, the Second Circuit has already found that the Statute has no impact on the relative proportions of local and out-of-state cigarettes sold in New York and has no unconstitutional effect on the interstate flow of goods. Essentially, the Second Circuit found that sales by out-of-state cigarette wholesalers and manufacturers were just as much a part of the flow of interstate commerce as sales made by out-of-state direct retailers.[8]

The Second Circuit's holding in *Brown & Williamson* is clear. The appeals court recognized that the Statute effectively eliminates all out-of-state direct retail cigarette sales. *Id.* at 213. Nevertheless, the court found that the Statute did not discriminate against interstate commerce for the reasons discussed fully in its opinion and summarized above. Based upon the record currently before this Court, it appears that the Second Circuit's holding directly contradicts the argument advanced by Plaintiffs in support of their claim. As this Court is bound to follow the rulings of the Second Circuit, it is unlikely that Plaintiffs will succeed on the merits of their claim based upon this argument.

#### b. *The Delivery Exception*

As noted above, subdivision two of the Statute prohibits common or contract carriers from "transporting" cigarettes directly to New York consumers. *See* N.Y. Pub. Health Law § 1399–*ll* (2). In addition, subdivision two makes it illegal for "any other person" to transport cigarettes directly to New York consumers. However, a person other than a common or contract carrier is permitted to transport "not more than eight hundred cigarettes [four cartons] at any one time to any person in this

---

8. Plaintiffs also argue that the instant case is analogous to *Swedenburg v. Kelly*, 232 F.Supp.2d 135 (S.D.N.Y.2002). In that case, the district court found that a New York ban on the direct shipment of out-of-state wine violated the Dormant Commerce Clause. *Id.* at 143–47. However, this Court finds *Swedenburg* distinguishable. The district court in that case found that the statute at issue *did* erect a barrier to the flow of goods in interstate commerce. *See id.* at 144–45. In addition, the court found that the statute facially discriminated against out-of-state wineries. *See id.* at 145. Neither of these factors are present in the instant case.

state." N.Y. Pub. Health Law § 1399-*ll* (2). This has been referred to as the "delivery exception."

Plaintiffs argue that the delivery exception has the effect of discriminating against interstate commerce. They contend that the exception allows in-state cigarette retailers to deliver cigarettes directly to customers. According to Plaintiffs, it would not be economically feasible for out-of-state cigarette retailers to make such deliveries. Plaintiffs assert that the Statute offends the Dormant Commerce Clause by conveying this competitive advantage to in-state businesses.

This Court finds that Plaintiffs' claim is unlikely to succeed based on this argument. Initially, this Court notes that nothing in the Statute precludes an out-of-state business from taking advantage of the delivery exception. A cigarette retailer located in any state is free under the Statute to transport cigarettes to New York customers—so long as he or she is not a common or contract carrier and does not ship more than four cartons to any one customer at any one time.

As such, Plaintiffs' argument is based solely on their assertion that it would be more difficult for them to take advantage of the exception than it would be for their in-state counterparts. In order to evaluate the merits of this argument it is necessary to determine *who* Plaintiffs' in-state counterparts are. The district court in *Brown & Williamson* determined that those plaintiffs' counterparts were all in-state cigarette retailers, including traditional "brick-and-mortar" retailers. *See Santa Fe*, 2001 WL 636441, at *17 (noting that "[t]here is every reason to suspect that the gainers will be New York retail businesses and that the losers will be out-of-state retailers").

However, the Second Circuit found this conclusion to be "erroneous" and held that the *Brown & Williamson* plaintiffs' "in-state counterparts are not New York brick-and-mortar retail outlets that sell cigarettes; rather, they are non-brick-and-mortar sellers who ship cigarettes directly to New York consumers following purchases made by Internet, telephone, or mail order." *Brown & Williamson*, 320 F.3d at 215–16 (citing *Ford Motor Co. v. Texas Dep't of Transp.*, 264 F.3d 493, 500 (5th Cir.2001) ("The [Supreme] Court's jurisprudence finds discrimination only when a State discriminates among similarly situated in-state and out-of-state interests.")).

Plaintiffs argue that *Brown & Williamson* is inapplicable because the plaintiffs in that case were cigarette manufacturers, rather than direct retailers. Plaintiffs in the instant case contend that they compete directly with brick-and-mortar retailers. In contrast, the *Brown & Williamson* plaintiffs apparently never presented any evidence that they competed with brick-and-mortar retailers. According to Plaintiffs, *Brown & Williamson* is distinguishable on this basis.

This Court finds that argument unavailing. First, the Second Circuit's decision in *Brown & Williamson* addressed a very broad issue: the Statute's impact on interstate commerce and, in particular, its effect on the ability of out-of-state businesses to ship cigarettes directly to New York customers. This is unsurprising given that the Statute is specifically designed to regulate the direct shipment of cigarettes to New York customers.

Second, the *Brown & Williamson* plaintiffs sold and shipped cigarettes directly to New York consumers.[9] The Second Circuit, in evaluating their challenge to the Statute, addressed the *Brown & William-*

---

**9.** Plaintiffs acknowledge this fact. (Plaintiffs' Memorandum of Law, p. 4, n. 2).

*son* plaintiffs in their capacity as direct sellers and shippers. As noted above, the Second Circuit determined that the plaintiffs' in-state counterparts were not brick-and-mortar retail outlets, but rather were "non-brick-and-mortar sellers who ship cigarettes directly to New York consumers following purchases made by Internet, telephone, or mail order." *Brown & Williamson,* 320 F.3d at 215–16. In the instant case, Plaintiffs are also direct sellers and shippers. This Court is bound to reach the same conclusion as the Second Circuit regarding who their in-state competitors are. In sum, this Court finds no basis on which to conclude that the Second Circuit's holding in *Brown & Williamson* should be limited in the manner suggested by Plaintiffs.

The next issue is whether Plaintiffs can show that "the Statute confers on their in-state counterparts a competitive advantage." *Id.* at 216. Plaintiffs contend that it confers such an advantage because out-of-state direct shippers will not realistically be able to take advantage of the Statute's "delivery exception," while it would be possible for in-state direct shippers to make such deliveries. This argument was accepted by the district court and rejected by the Second Circuit in *Brown & Williamson.* The Second Circuit found that the delivery exception provided a *"de minimus"* advantage to in-state retailers, which was "insufficient to establish a discriminatory effect." *Id.* at 216 (citing *Hunt,* 432 U.S. at 349, 97 S.Ct. 2434 ("[N]ot every exercise of state authority imposing some burden on the free flow of commerce is invalid.")). Indeed, in reaching this conclusion, the Second Circuit even assumed *arguendo* that an out-of-state direct shipper's in-state counterparts might include in-state brick-and-mortar retail outlets. *See Brown & Williamson,* 320 F.3d at 216 ("Even if the Plaintiffs' in-state counterparts include brick-and-mortar retail outlets . . . .").

Based upon the record as it currently stands, this Court finds that the delivery exception arguments offered by Plaintiffs in support of their Dormant Commerce Clause claim were squarely addressed and rejected by the Second Circuit in *Brown & Williamson.* As this Court is bound to follow the rulings of the Second Circuit, it is unlikely that Plaintiffs will succeed on the merits of their Dormant Commerce Clause claim based upon the argument that the Statute discriminates against interstate commerce.

### 2. *The Pike Balancing Test*

For the reasons discussed *supra* in Section III.B.1, this Court finds that Plaintiffs are unlikely to succeed on their Dormant Commerce Clause claim based upon the argument that the Statute discriminates against interstate commerce. However, Plaintiffs might still be able to establish a Dormant Commerce Clause violation if they can show that the Statute imposes burdens on interstate commerce that are "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). This is known as the "*Pike* balancing test."

In *Brown & Williamson,* the district court found that the Statute was unconstitutional because, *inter alia,* it failed the *Pike* test. Specifically, the district court found that the Statute "directly and substantially burdens interstate commerce and isolates New York from the national cigarette market." *Santa Fe,* 2001 WL 636441, at \*29. While the district court found that the Statute was designed to advance "wholly laudable" public health and safety goals, it concluded that these goals would not be "meaningfully address[ed]" by the Statute because of several "loopholes which are fatal to its effectiveness." *Id.* at \*29, \*20. Plaintiffs in

the instant case urge this Court to reach that same conclusion.

However, in *Brown & Williamson,* the Second Circuit found the district court's conclusion "erroneous." 320 F.3d at 217. The appeals court applied the *Pike* balancing test and found that the Statute did not violate the Dormant Commerce Clause. *See id.* at 216–219 (application of the *Pike* test to the Statute). Given the detailed analysis in *Brown & Williamson,* this Court need not linger on this point. The Second Circuit's holding is neatly summarized in the following quotation:

> [T]he Statute, at most, incidentally affects interstate commerce by prohibiting one method for selling cigarettes to New York consumers. Moreover, the Statute in no way isolates New York from the national cigarette market because it does not obstruct or impede the flow of cigarettes into New York State. Because the Statute's effects on interstate commerce are *de minimus,* we find that they are not "clearly excessive in relation to the putative local benefits."

*Id.* at 217 (quoting *Pike,* 397 U.S. at 142, 90 S.Ct. 844).

Given this clear holding, it appears unlikely that Plaintiffs' Dormant Commerce Clause claim will be successful based upon the argument that the Statute fails the *Pike* balancing test.

### 3. *State Taxation of Interstate Commerce*

■ Plaintiffs offer a final argument in support of their Motion for a Temporary Restraining Order. They contend that the Statute runs afoul of another line of Dormant Commerce Clause cases that address the issue of state taxation of interstate commerce. This argument was not directly before the Second Circuit in *Brown & Williamson.*

The Supreme Court reviewed the issue of state taxation of interstate commerce in *Quill Corp. v. North Dakota,* 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992). Quill was a Delaware corporation that sold office supplies to customers nationwide through mail order. *Id.* at 302, 112 S.Ct. 1904. Although some of Quill's customers lived in North Dakota, the company had no other legally significant connection with that state. *Id.* In 1987, North Dakota amended one of its tax statutes to require mail order companies that regularly or systematically solicited business in North Dakota to collect and pay a use tax on all sales to North Dakota customers. *Id.* at 302–303, 112 S.Ct. 1904. Quill refused to pay the tax and North Dakota sued to enforce the law. *Id.* at 303, 112 S.Ct. 1904.

Quill argued that the statute was unconstitutional because *inter alia* it placed an undue burden on interstate commerce. The Supreme Court agreed and reaffirmed its earlier decision in *Nat'l Bellas Hess, Inc. v. Dep't of Revenue of the State of Illinois,* 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967), which the Court said "stands for the proposition that a vendor whose only contacts with the taxing State are by mail or common carrier lacks the 'substantial nexus' required by the Commerce Clause." *Quill,* 504 U.S. at 311, 112 S.Ct. 1904.

In the present case, Plaintiffs argue that they have no substantial nexus with New York State. As such, they assert that the Statute violates the Commerce Clause, as interpreted by the *Bellas Hess/Quill* lines of cases. In support of this argument, Plaintiffs contend (1) that the Statute is a veiled attempt to tax interstate commerce and (2) that even if the Statute is a public health law, a substantial nexus with New York is still required. For the following reasons, this Court finds that Plaintiffs' Dormant Commerce Clause claim is unlikely to succeed based upon this argument.

First, the Statute does not directly tax interstate commerce. It is codified in the New York Public Health Law and the legislative findings indicate that it was designed to address a "serious threat" to public health, safety, and welfare. *See* N.Y. PUB. HEALTH LAW, ch. 262, § 1. Most significantly, in *Brown & Williamson*, the Second Circuit characterized the Statute as a "regulation of the importation and sale of cigarettes ...." and a "legitimate exercise of state power in the public interest ...." *See Brown & Williamson*, 320 F.3d at 216–17.

There appears to be little doubt that the Statute will likely have the effect of increasing the State's tax revenues. However, no tax is being laid *directly* on interstate commerce. The Statute regulates the interstate and intrastate shipment and transportation of cigarettes, but does not directly impose any tax on cigarettes. Although the Statute is designed (in part) to discourage adult consumption of cigarettes and offset increased health care costs associated with smoking by insuring that New York smokers pay taxes when they buy cigarettes, this Court finds no basis on which to conclude that this indirect tax consequence should have the effect of transforming a public health statute into a tax statute for purposes of Commerce Clause analysis.[10]

Second, although there appears to be no Second Circuit precedent directly on point, this Court finds that the *Bellas Hess/Quill* line of cases have been properly limited to the area of direct state taxation. As the Tenth Circuit Court of Appeals noted "[t]he Supreme Court in *Quill* repeatedly stressed that it was preserving *Bellas Hess'* bright-line rule 'in the area of sales and use taxes.'" *American Target Adver., Inc. v. Giani*, 199 F.3d 1241, 1255 (10th Cir.2000) (quoting *Quill*, 504 U.S. at 316, 112 S.Ct. 1904). *Bellas Hess* and *Quill* both "concern[ed] the levy of *taxes* upon out-of-state entities." *American Target*, 199 F.3d at 1255 (emphasis in original).

Further, the *Bellas Hess/Quill* cases are particularly inapplicable where (as here) a State is regulating in the public interest pursuant to its police power. *See Ferndale Labs., Inc. v. Cavendish*, 79 F.3d 488, 494 (6th Cir.1996). In *Ferndale*, the court noted that "virtually every precedent relied upon by the [Supreme] Court in deciding *Quill* was concerned with attempts by states to tax interstate commerce directly." *Id.* at 494. Thus, those cases did not apply to "a statute passed by [a State] under its police powers" and designed "to protect [its] citizens ... rather than simply trying to collect a tax." *Id.*

Based upon the record as it currently stands and (most importantly) the Second Circuit's conclusion in *Brown & Williamson*, this Court finds that the Statute is a public health law enacted by New York pursuant to its police powers, rather than simply an effort to collect a tax. It does not involve the direct taxation of interstate commerce and, as such, the *Bellas Hess/Quill* cases are inapplicable. Thus, Plaintiffs are unlikely to succeed on their claim that the Statute violates the Dormant Commerce Clause based upon those cases.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Temporary Restraining Or-

10. At oral argument, Plaintiffs' counsel made several assertions regarding the legislative history of the Statute. Specifically, counsel asserted that the bill was never submitted to the Health Committee and never had a public hearing. Rather, it was apparently submitted only to the Ways and Means Committee. Even assuming these assertions to be true, this Court finds Plaintiffs' argument unavailing. The question is whether the Statute at issue imposes a direct tax on interstate commerce. This Court finds that it does not.

der is denied. This Court finds that Plaintiffs have not demonstrated a likelihood of success on the merits of their Dormant Commerce Clause claim. In *Brown & Williamson*, the Second Circuit held that the Statute did not violate the Dormant Commerce Clause. This Court finds that holding fully applicable to the facts presented in the instant case. Further, this Court finds the *Bellas Hess/Quill* line of cases inapplicable to the present action, which does not involve direct state taxation of interstate commerce.

## V. *ORDERS*

IT HEREBY IS ORDERED that Plaintiffs' Motion for a Temporary Restraining Order (Docket No. 10–1) is DENIED.

FURTHER, that counsel for the parties shall appear before this Court on Friday, June 27, 2003, at 10:30 a.m. in Part IV, United States Courthouse, 68 Court Street, Buffalo, New York for a status conference.[11]

SO ORDERED.

---

11. Plaintiffs have also moved for a Preliminary Injunction. At oral argument on June 19, Plaintiffs requested an Expedited Hearing on that motion. Issues relating to scheduling, procedures, and the specific subject matter of that hearing will be addressed at Friday's status conference.